## In re MARTIN-VERNON MUSIC CO.

(District Court, W. D. Missouri, W. D. November 14, 1904.)

1. BANKRUPTCY—RECOVERY OF GOODS SHIPPED TO BANKRUPT—BAILMENT OR SALE.

Pianos were shipped to bankrupt, which was a corporation dealing in musical instruments, under a written contract, which stated the prices of each kind, and provided that each instrument should be paid for in cash when sold. It contained no provision for the payment of commissions on the sales or for the return of the pianos under any circumstances, and they were billed as sold. *Held,* that the transaction was not a bailment, but a sale, by which the title passed to the bankrupt, and the pianos could not be recovered by the seller after the bankruptcy.

2. SAME—INCONSISTENT CLAIMS.

A concern which, after shipping goods to a customer, to be paid for when sold, and a short time prior to the customer's bankruptcy wrote requesting payment or settlement, offering to accept notes secured by collateral, but treating the transaction as a sale, cannot after the bankruptcy claim the return of the goods from the trustee on the ground that they were shipped on consignment.

In Bankruptcy. On certificate from referee.

Elijah Robinson, for intervener.

Karnes, New & Krauthoff, for trustee.

PHILIPS, District Judge. The Smith & Nixon Piano Company, of Cincinnati, Ohio, heretofore filed an intervening petition before the referee in bankruptcy, claiming the return of eight pianos alleged to be in the possession of the bankrupt at the time of the adjudication in bankruptcy, six of which are now in the possession of the trustee in bankruptcy. As two of the pianos were sold by the Martin-Vernon Music Company before the institution of the proceedings in bankruptcy, and the claimant has filed proof of claim therefor as a debt against the estate, they are not in the controversy herein. The referee having disallowed the claim as to the remaining six pianos, the intervener excepted to this finding, and the same has been certified to this court for review.

The goods in question were shipped, as claimed by the interpleader, under a written contract of date February 2, 1904. There being no latent ambiguity as to the terms of the written contract, much of the parol evidence offered by the interpleader and heard by the referee respecting the understanding of the claimant was inadmissible. Burress v. Blair, 61 Mo. 133. By the first paragraph of the written agreement the claimant, the Smith & Nixon Piano Company, agreed to furnish to the Martin-Vernon Music Company Smith & Nixon and Ebersole pianos, on memorandum, at the following prices (the prices of the pianos are then stated). By the second paragraph the Martin-Vernon Music Company agreed to pay for every piano they sold, cash, and were

to receive for advertising purposes on the above prices a special discount of $15 on the Ebersole piano and $25 on the Smith & Nixon piano. By the third paragraph it was agreed between the parties that the Martin-Vernon Music Company should have full control of a certain designated territory, in which the Smith & Nixon Manufacturing Company agreed not to give any other prices to any other dealer. The goods were shipped on the 6th and 13th days of February, 1904. The bills rendered therefor have the following caption: "The Smith & Nixon Piano Company, Sold to the Martin-Vernon Music Company, Kansas City, Mo." Then follows a description of the goods shipped. There is not a word in the agreement about the goods being delivered under consignment. No commission whatever is fixed or compensation provided for the Martin-Vernon Music Company. It is on its face a bald undertaking on the part of the claimant to furnish their pianos to the Martin-Vernon Music Company at a fixed price, to be paid for when sold; and therefore, when sold, the purchase price became a fixed debt. There is no provision in the contract that the Martin-Vernon Music Company could at any time return the pianos unsold. The Martin-Vernon Music Company, under this agreement, could sell the pianos at any time, at any price they might see fit, pocketing the profits, if any, and standing the loss, if any.

It was suggested by interpleader's counsel on the argument that the term "on memorandum," employed in the contract, by usage of the trade, meant that the goods were shipped under a contract of consignment. If it were conceded that the term is susceptible of explanation by parol evidence, there is no evidence in this record to support counsel's contention. The witness Bolze, introduced by claimant, over the objection of counsel for the trustee stated that "these pianos were shipped on memorandum, what we term an approval." The witness James M. Martin, who was at the time acting for the Martin-Vernon Music Company, in the course of his examination testified, over the objection of counsel for the trustee, "My understanding is that the pianos were sent on memorandum of approval." Conceding this to be admissible, no other reasonable import can be given thereto than that the pianos shipped, with the prices stated, were subject, on receipt, to the approval of the Martin-Vernon Music Company as to whether they would accept them on inspection. As already stated, the Martin-Vernon Music Company was at liberty to sell the pianos at any advanced price they pleased and pocket the entire profits. There being no promise on the part of the consignor to allow or pay the consignee any commission or compensation for its services, the transaction is utterly inconsistent with the idea of a bailment. While it is true that the mere fact of the bills rendered stating "Sold to the Martin-Vernon Music Co." cannot control the terms of the written contract inconsistent therewith, yet under such a contract as the one in question the language of the bills rendered becomes a factor in ascertaining the understanding of the shipper. The case of Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093, relied upon by counsel for claimant, in its facts is so unlike the contract under consideration as scarcely to need analysis to differentiate it. The memorandum contract in that case expressly stated that the goods were shipped "on consignment account," with

directions to the consignee to sell "to the best advantage"; with the further statement that, if the arms shipped were not disposed of at the whole amount charged, the consignor was to bear the loss, and the profits were to be equally divided between them; with the further provision that, in case any of them should not be sold, "they shall be returned to us free of all charges"; and, further, that "in case they should not find a ready sale, they shall be returned to us free of all charges"; with directions to attend to the insurance for the benefit of the consignor. The court very properly held that to be a consignment on bailment. Mr. Justice Jackson, who delivered the opinion, laid down the rule to be that:

"The recognized distinction between bailment and sale is that, when the identical article is to be returned in the same or in some altered form, the contract is one of bailment, and the title to the property is not changed. On the other hand, where there is no obligation to return the specific article, and the receiver is at liberty to return another thing of value, he becomes a debtor to make the return, and the title to the property is changed; the transaction is a sale."

. In Re Rabenau, 118 Fed. 471, this court reviewed the authorities, and discussed the line of demarkation between a bailment and a sale. It does seem to me to hold that under such contract the claimant could send its goods to the bankrupt company, and on its failure claim them as against the general creditors of the estate, would be to practically nullify the provisions of section 3412, Rev. St. Mo. 1899, which provides, in substance, that, where any personal property shall be sold to any person to be paid for in whole or in part in installments, or delivered to another on condition that the same shall belong to the person receiving the same whenever the amount paid shall be a certain sum, or of the value of such property, the title to the same to remain in the vendor or deliverer until such sum or value of such property, or any part thereof, shall have been paid, such condition shall be void as to all subsequent purchasers in good faith and creditors, unless such condition shall be evidenced by writing executed, acknowledged, and recorded as provided in case of mortgages of personal property. This statute was intended to put an end to just such simulated arrangements and agreements as the one in question, under which the vendor might, as the emergency arises, assume the attitude of a vendor as to his consignee or a bailor when the day of reckoning should come with other creditors.

There is another view of this case based upon the evidence which should preclude a recovery by the interpleader. As already stated, the bills of goods rendered show that they were shipped February 6 and 13, 1904. On July 30, 1904, the interpleader wrote to the Martin-Vernon Music Company respecting the claims, in which it was stated that the pianos were consigned with the understanding that they would be settled for as sold, and paid for in cash when sold, and that they would be moved with reasonable promptness. The letter then states that four months had elapsed since the goods were received by Martin-Vernon Music Company, and that a settlement must be insisted upon. It concludes as follows: "If not convenient to send cash, we will accept your paper secured by the collateral, and give you liberal time. We are willing to help you, but do not care for dead stock." The mean-

ing of which is that, as the debtor had not promptly sold, it was expected to settle in cash or notes secured by collateral; and that the claimant would not then accept a return of the goods, as they were considered "dead stock." So, even if the claimant had hitherto regarded the consignee as a bailee of the goods, from that time it elected to regard the goods as "dead stock" at the holder's risk, looking to it for the money value. Thus the matter stood until the Martin-Vernon Music Company was adjudged bankrupt on the 30th day of August, 1904. As against the general creditors of the bankrupt, represented by the trustee in bankruptcy, the interpleader should not now be allowed to shift position and claim that the bankrupt held the goods merely on bailment. So far as shown by the evidence in this case, both parties to the contract, after the receipt of the letter of July 30, 1904, remained silent until the adjudication in bankruptcy, enforcing the conclusion that both parties stood on the election to treat the "dead stock" as the property of the Martin-Vernon Music Company, and that the interpleader was looking for the cash payment or a time note with collateral. The claimant's attitude in this controversy is double. If there had been no failure and adjudication in bankruptcy, the Martin-Vernon Company was to be held as a debtor for the value of the goods, for the reason that the debtor held the goods until they became "dead stock"; but, as it became bankrupt, that which was dead became alive, and the goods in kind are claimed.

In either view of this case, the exceptions to the referee's findings must be overruled.