## In re SMITH & NIXON PIANO CO.

(Circuit Court of Appeals, Eighth Circuit. November 21, 1906.)

### No. 57.

BANKRUPTCY—RECOVERY OF COST—BAILMENT OR SALE.

Pianos were shipped to a corporation dealing in musical instruments, which subsequently became a bankrupt, under a written contract stating that they were furnished on memorandum, also the price of each kind, and providing that the bankrupt should "pay for every piano they sell, cash." When pianos were furnished under the contract, invoices were sent containing a recital that the shipper sold the pianos described to the bankrupt, and shortly before bankruptcy proceedings were instituted the shipper wrote the bankrupt, stating that, when the pianos were consigned, it was with the understanding that they should be settled for as sold and paid for in cash when sold, that the shipper insisted on a settlement, and that, if it was not convenient to send cash, the shipper would accept paper secured by the collateral, but "did not care for dead stock." *Held*, that the transaction was a bailment, and not a sale; and that the title to the unsold pianos never passed to the bankrupt.

Petition for Revision of Proceedings of the District Court of the United States for the Western Division of the Western District of Missouri, in Bankruptcy.

Elijah Robinson, for petitioner.

Edwin A. Krauthoff, for respondent.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. This petition to revise presents a controversy over the ownership of six pianos. The piano company intervened in the bankruptcy proceedings and petitioned for their restoration, claiming that it had consigned them to the Martin-Vernon Music Company, the bankrupt, to be sold on commission. The trustee who had possession of the pianos asserted that the transaction was a sale, and that by virtue of the adjudication and his appointment and qualification he had succeeded to the bankrupt's title. A decision of the referee in favor of the trustee was affirmed by the District Court (132 Fed. 983).

At the hearing below the facts were not disputed. There was no conflict in the evidence, which consisted of a contract, two invoices, a letter, and some oral testimony. The testimony of the witnesses did not in any wise affect the legal import of the writings. The sole question was as to the character of the transaction between the piano company and the bankrupt—whether a bailment or a sale—and it turned wholly upon the construction of the written instruments. The question was therefore one of law, and a petition to revise is a proper method of bringing such a question to this court.

The pertinent provisions of the contract are as follows:

"The Smith & Nixon Manufacturing [Piano] Company agrees to furnish to the Martin-Vernon Music Company, of Kansas City, Mo. [the bankrupt], Smith & Nixon and Ebersole pianos, on memorandum, at following prices: [then follows a schedule showing the styles of pianos and the respective prices.] The Martin-Vernon Music Company agrees to pay for every piano they sell, cash, and will receive for advertising purposes, on the above prices, a special

discount of $15.00 on the Ebersole Piano, and $25.00 on the Smith & Nixon Piano."

There is also a provision that the bankrupt should have full control of certain designated territory and that the piano company should not give prices to any other dealer therein. When the pianos were furnished under this contract invoices were sent containing the words:

"The Smith & Nixon Piano Company * * * Sold to the Martin-Vernon Music Company, Kansas City, Mo."

About six months afterwards, and shortly before the commencement of the proceedings in bankruptcy, the piano company wrote to the bankrupt as follows:

"When we consign the pianos to you, it was with understanding they would be settled for as sold and paid for in cash, when sold, and that they would be moved with reasonable promptness. It is now over four mos. since these goods were received. We must insist upon a settlement. If not convenient to send cash, we will accept your paper secured by the collateral, and give you liberal time. We are willing to help you but do not care for dead stock."

While the case is not free from doubt, a careful consideration of the terms of the original contract has led us to the conclusion that the parties intended that no title should pass from the piano company, and that no debt should be created unless the pianos were sold by the bankrupt. At no place was the word "sale" or any term of similar import used. The piano company was to "furnish pianos on memorandum," an expression which is more appropriate to a bailment for sale than it is to a sale. On the other hand, the bankrupt agreed to "pay for every piano they sell, cash"; and there was no provision for payment in any other event or at any other time or in any other manner. The reasonable inference from this is that, if the bankrupt did not sell the pianos, it did not owe and was not to pay for them. The payment of a consideration or the creation of a debt for it is an essential element of a sale; but here there was no payment at the delivery of the pianos, nor did a debt arise either by expressed provision or by implication. There was no present or fixed obligation to pay either then or in the future. Nor can the promise of the bankrupt to pay a specified amount for every piano it sold be turned into a promise to pay within a reasonable time or earlier if sale is made. This peculiar phraseology of the contract does not relate to the time of maturity of a debt created by the furnishing of the piano. On the contrary, it was intended to define the condition upon which a debt arose. In other words, it signifies that, if there was no sale, there should be no debt. If the piano company had sued the bankrupt for the price of the pianos, it seems clear that it would have been a sufficient defense that the latter had been unable to sell them. The obligation of the bankrupt to pay for each piano it sold is the ordinary obligation of a factor or commission merchant who, having received goods on commission, has made a sale of them. While there was no express reservation by the piano company of dominion over the pianos before they were sold, such dominion nevertheless existed as a natural incident to a title it had not parted with. We start with title in the piano company, and unless an intention that it

pass to another can be discovered it remains where it was with all appurtenant rights. It is said that the schedule of fixed prices appearing in the contract tends to show that a sale was intended. We held, however, in Re Columbus Buggy Company (C. C. A.) 143 Fed. 859, that such provisions were comparatively unimportant in determining whether a transaction was a bailment for sale or a sale. The specification of fixed prices is as appropriate to one as to the other. It is not an uncommon feature of contracts of bailment, and it means that the commission of the consignee is such sum as he may obtain for the property above the price specified. Allowances or discounts for advertising such as were made to the bankrupt are obviously for the benefit of both parties, and they make for neither construction.

As to the invoices and the letter. The acts of the parties subsequent to the written contract may be regarded for two purposes: First, as an aid to the construction, if the true meaning of the contract is doubtful and the acts were before a controversy arose; and, second, to ascertain whether the parties have mutually agreed upon a change or modification of their original contract relations. The fact that the invoices contained the words "Sold to the Martin-Vernon Music Company" may be disposed of by reference to Dows v. Bank, 91 U. S. 618, 630, 23 L. Ed. 214, where it was said that an invoice is not evidence of a sale; that it is a mere detailed statement of the nature, quantity, and cost or price of the things invoiced, and is as appropriate to a bailment as to a sale. See, also, Sturm v. Boker, 150 U. S. 312, 326, 14 Sup. Ct. 99, 37 L. Ed. 1093, and Schenck v. Saunders, 13 Gray (Mass.) 37, 40.

While it is not altogether clear what conception of the transaction the writer of the letter had, the language he used is as consistent with the idea of a bailment as with that of a sale. He said that the pianos were consigned, when it would have been quite natural for him to have said that they were sold if such was the case. He said they were to be settled for as sold and paid for in cash when sold; that they were to be moved with reasonable promptness, and since more than four months had elapsed a settlement was insisted on. He then concluded:

"If not convenient to send cash, we will accept your paper secured by the collateral, and give you liberal time. We are willing to help you, but do not care for dead stock."

The words "the collateral" signify that the writer had in mind not collateral in general, but some particular collateral, and it probably was paper taken by the bankrupt upon sales which it had made of two pianos furnished under the same contract, but not involved in the present controversy. Again, if the pianos had been sold to the bankrupt, the piano company having parted with its title to them, it is not apparent why the writer should have said that his company did not care for dead stock. He could hardly have referred to a debt of the bankrupt as "dead stock." The expression is, however, perfectly consistent with the position that the goods were consigned for sale on commission; that it was understood that the bankrupt would be able to sell them soon; that several months had elapsed without results to the piano company; and that, while it was willing to help the bankrupt, it did not desire to carry dead stock.

But if it be said, and there are grounds for the position, that the letter fairly bears the construction that the piano company, having consigned the pianos on commission, was disappointed with the outcome and was trying to force the bankrupt to settle for them by giving its note secured by collateral, it must be at once answered that the effort failed. The bankrupt was silent. It did not agree to the demand of the piano company, and the relations of the parties, not being changed by mutual consent, remained as they originally were. And, if the letter were susceptible of this construction, it should also be added that it would not estop the piano company from asserting its rights under the original contract. No element of estoppel existed. The bankrupt does not appear to have consented to that construction, to have yielded to the demand for settlement, or to have altered its position in any way by reason thereof. An estoppel does not arise from the bare assertion of an untenable position by one of the parties to a transaction.

The petition to revise is sustained, and the order of the District Court is vacated and set aside, with direction to allow the claim of the petitioner to the property in controversy.