### In re HANDY.

### Petition of PEERLESS FERTILIZER CO.

(District Court, D. Maryland. January 13, 1915.)

1. SALES (§ 3*)—NATURE OF TRANSACTION—AGENCY OR SALE.

A contract between a fertilizer company and a dealer provided that it would furnish him fertilizers at specified prices, to be sold at such advanced prices as he might elect, such advance to constitute his entire commission and profit, that by August 1st and October 1st of each year he would make full settlement in cash or notes of purchasers, indorsed by him, and guarantee the payment of all notes and accounts, that he would hold all fertilizers as the company's property, and store and insure same at his expense for its account, and that, when sold, the entire proceeds of sales, including cash, notes, open accounts, and collections, were to be turned over to it until his obligation to it had been settled in full. *Held* that, when the agreement was fully performed by a complete settlement for the fertilizers received by the dealer, the result would be precisely the same as if there had been a sale, but until that time the relation was that of bailor and bailee, or principal and agent, and the company had all the right to the fertilizer that it would have had if the dealer had been its sales agent and nothing more.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 6–19; Dec. Dig. § 3.*]

2. SALES (§ 48*)—NATURE OF TRANSACTION—AGENCY OR SALE.

Such contract was contrary to no statute or rule of public policy, though the company might be estopped to assert its title to the prejudice of third persons dealing with the agent under the belief that he was the owner of the fertilizer.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 101–107; Dec. Dig. § 48.*]

3. SALES (§ 89*) — NATURE OF TRANSACTION — MODIFICATION BY SUBSEQUENT AGREEMENT.

While the parties could end the relation created prior to a settlement by the dealer by a mutual agreement, an intention to change the relation should not be lightly inferred from casual words, or even acts, in view of the fact that it is difficult for laymen to keep clearly in mind the differences between sales and deliveries to del credere agents for sale; but when, by a long and consistent course of dealing, they either put one of two or more possible constructions upon the contract, or upon a sufficient legal consideration mutually agreed to alter it, such construction or agreement was binding.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259; Dec. Dig. § 89.*]

4. BANKRUPTCY (§ 139*)—LIENS—NATURE OF TRANSACTION—MODIFICATION BY SUBSEQUENT AGREEMENT.

Where, prior to August 1, 1913, the company requested settlement at that time for fertilizer "purchased" the previous spring, but accepted the dealer's note for four months, allowing a discount as if it were a cash settlement, several times renewed the note, and accepted part cash and a new note for the balance due on such note and the open account due August 1, 1914, and at no time inquired as to his collections from his customers, or showed any interest in the state of accounts between him and his customers until after he became bankrupt, but apparently treated the adjustment by means of the notes and part payments as final settlements, it lost its rights to his customers' accounts, and was merely a general creditor of the bankrupt estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 193, 198, 199, 210–219; Dec. Dig. § 139.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Bankruptcy. In the matter of Samuel J. Handy, bankrupt. On petition of the Peerless Fertilizer Company to require the trustee to turn over to it open accounts due the bankrupt. Petition denied, and petitioner adjudged a general creditor of the estate.

James U. Dennis, of Baltimore, Md., for trustee.
L. Wethered Barroll, of Baltimore, Md., for Peerless Fertilizer Co.

ROSE, District Judge. [1] The Peerless Fertilizer Company makes and sells fertilizers. It will be called the company. Samuel J. Handy kept a country store at Shelltown, in Somerset county. He engaged in other activities. He bought from the farmers in his neighborhood, as well as sold to them. On the 7th of October, 1914, he was on his own petition adjudicated a bankrupt. He will be referred to as such. The company asks that his trustee turn over to it open accounts to the amount of about $1,000 due the bankrupt by various persons to whom he sold fertilizers obtained from it. Prior to 1912 it and its predecessors had built up in Somerset county a considerable demand for its goods. The bankrupt wanted to handle them, and so told its salesman. In January, 1912, it made a contract with him. The terms were for the most part printed. It was in a form drafted by the counsel for a number of fertilizer manufacturers and used by many of them. A similar agreement was made between the bankrupt and the company early in 1913, and again in 1914. By each of these contracts it agreed to furnish him for sale at certain named prices fertilizers to be sold by him at such advanced prices as he might elect. It was stated that such advance was to constitute his entire commission and profit. On or before a date named, which in 1913 and in 1914 was August 1st, he was to make full settlement in cash or notes of the purchasers indorsed by him, which notes were to mature not later than November 1st. He was to receive a discount of $5 a ton for all cash settlements made on or before August 1st for spring, and on or before October 1st for fall, goods. He guaranteed the payment of all notes and accounts at maturity. He undertook to hold all the fertilizers as the company's property. He was to store and insure them at his expense for its account. When sold, the entire proceeds of the sale, including cash, notes, open accounts, and collections thereon were to be kept separate, and turned over to it, until his obligation to it had been settled in full. After it had shipped the fertilizers, it was to be at no expense whatever. In 1912, and again in 1913, he agreed to take not less than 20 tons a year, and in 1914 not less than 30. It reserved the right to cancel the contract at any time, should his financial standing or manner of doing business be found unsatisfactory.

By such agreement the parties intend that when it is fully performed the result will be precisely the same as if the goods had been sold by the one to the other, but until that time the original owner of them shall have all the security he would have, had the other party been his sales agent and nothing more.

[2] No policy of the law forbids such a contract. In the absence of statute to the contrary, it is binding. Ludvigh v. American Woolen Co., 231 U. S. 522, 34 Sup. Ct. 161, 58 L. Ed. 345; In re Smith &

Nixon Piano Co., 149 Fed. 111, 79 C. C. A. 53; John Deere Plow Co. v. McDavid, 137 Fed. 802, 70 C. C. A. 422; In re Columbus Buggy Co., 143 Fed. 859, 74 C. C. A. 611; Walter A. Wood Co. v. Eubanks, 169 Fed. 929, 95 C. C. A. 273; Walter A. Wood Mowing & Reaping Machine Co. v. Vanstory, 171 Fed. 375, 96 C. C. A. 331.

It is true that the principal may sometimes be estopped to assert his title to the prejudice of some third person who has dealt with the agent under the belief that he was the owner. It is not necessary here to consider what rights those who owe the accounts in controversy may have to offset any sums due by the bankrupt to them.

[3] The agreements between the company and the bankrupt did not make or evidence conditional sales, nor did they create secret liens in favor of the company upon property which had once been his. They established, and they were intended to establish, between them the relation of bailor and bailee, of principal and agent. That relation, however, necessarily came to an end whenever complete settlement was made by the bankrupt for the fertilizers received by him from the company. It could have been ended at any earlier period by the mutual agreement of the parties. Such an agreement could have been evidenced by words or by deeds. It must be borne in mind, however, that it is difficult for laymen to keep clearly in mind at all times some of the differences between sales and deliveries for sale to del credere agents. An intention to change the relation which has been carefully created should not be lightly inferred from casual words or even acts. In re Smith & Nixon Piano Co., supra.

Where, however, by long and consistent course of dealing they show, either that they have put one of two or more possible constructions upon their original contract, or have, upon sufficient legal consideration, mutually agreed to alter it, they have the right to do so, and what they have done is binding upon them.

[4] The trustee in this case contends that the contracts call for a final settlement on August 1st in each year, either in cash or in notes of the purchasers indorsed by the bankrupt. He says that such settlement was made. It is true that it was not made in cash, but it was in notes of the bankrupt, which the trustee asserts were accepted by the company as cash. Were they? All the dealings between the parties appear to have been conducted by correspondence. The bankrupt produces the company's letters to him. It says that his to it have been mislaid. On July 28, 1913, it wrote him that it had about $11,000 to pay on August 1st; that it had gone over its books to see which of its friends it could call upon to help it out, and had come across his account "for fertilizer purchased this past spring." It told him that, if he could conveniently let it have a check on or before August 1st, it would be highly appreciated. He did not give it his check, but did give it his four-months note payable December 1st. In arriving at the amount of this note he was allowed the discount of $5 a ton as if it were a cash settlement. It turned out that some part of the account was for fall goods, for which he was not required to settle until October 1st. The note he gave, therefore, included four months' interest on the price of such of the goods as should have been paid for August

1st, and two months' interest on those the bill for which was not due until October 1st. Not one word was said by either of the parties as to his turning over accounts or customers' notes. No question was asked, then or at any other time prior to the bankruptcy, as to whether he had such accounts or notes. His note was for $1,106.07. When it fell due in December he asked the company to renew it. It told him that, if he would reduce it to $1,000, it would. There was here no suggestion that he should turn over what he had received from his customers. The amount by which he was asked to reduce it was precisely the sum which would leave the note an even $1,000. It was again renewed in the succeeding April, and again nothing was said about his accounting for what he had received from purchasers of the fertilizer.

This note matured in August, 1914, at the time at which he should have made settlement for the spring goods of that year. At that time it pressed him for the total amount of the 1914 purchases, although the price of such of them as were fall goods was not payable until October 1st. His 1914 purchases amounted to $814.60, so that, with his $1,000 note, representing the balance due by him for his 1913 purchases, the total indebtedness was $1,814.60. It was willing to give him until October 1st on $1,500 of it. Interest on $1,500 for two months would be $15, making his total indebtedness as of October 1st $1,829.60. It offered to take from him $329.60 cash and his note at two months for the remaining $1,500, and it said, if he wished, he could have the time for the payment of that note extended 30 days. He accepted the proposition, paid the $329.60, and gave his note for the $1,500. The company never as much as asked him what collections he had made from any of the persons to whom he had sold fertilizers. It and he evidently treated the adjustment with him on the 1st of August of each year as a final settlement. It showed no interest in the state of accounts between him and his customers. It took his notes as the equivalent of cash, allowing him the discount he would have been entitled to for a cash payment. All the transactions between them up to the 1st of August of each year were merged in the notes it then took from him. The course of dealing was such as to fully justify him in treating his customers' accounts as his, and as to at least $500 he did so.

The company is a general creditor of the estate, and is not entitled to the outstanding accounts due the bankrupt for fertilizers obtained by him from it and sold to his customers.