## LUDVIGH, TRUSTEE IN BANKRUPTCY OF HORO-WITZ, *v.* AMERICAN WOOLEN COMPANY OF NEW YORK.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 55.   Argued November 7, 10, 1913.—Decided December 15, 1913.

A contract under which goods are delivered by one party to another to be sold by the latter and proceeds paid to the former less an agreed discount, the unsold goods to be returned to the consignor, is really a contract of bailment only, and the consignor can, in the absence of fraud, take them back in case of the consignee's bankruptcy. 188 Fed. Rep. 30, affirmed.

THE facts, which involve the construction of a contract for consignment of goods to a bankrupt and the rights of the consignor thereunder, are stated in the opinion.

*Mr. Abram I. Elkus,* with whom *Mr. Garrard Glenn* was on the brief, for appellant.

*Mr. Daniel P. Hays,* with whom *Mr. Edwin D. Hays* was on the brief, for appellees.

MR. JUSTICE DAY delivered the opinion of the court.

This was a suit in the District Court of the United States for the Southern District of New York by Ludvigh, as trustee in bankruptcy of the firm of Philip Horowitz & Son, to set aside as fraudulent certain transactions of the bankrupts with the American Woolen Company of New York (which we will call the "Woolen Company"), and to recover for goods taken from the bankrupts by the Woolen Company prior to the institution of proceedings

in bankruptcy. The District Court held in favor of the trustee and sustained his right to recover the value of the goods so taken (176 Fed. Rep. 145). Upon appeal to the Circuit Court of Appeals for the Second Circuit the judgment of the District Court was reversed (188 Fed. Rep. 30), and the case is here upon appeal.

The facts as found by both courts are very little in dispute. It appears that Horowitz & Son, the bankrupts, had had a contract in writing with the Woolen Company which expired on December 1, 1902, whereby goods were to be consigned to Horowitz & Son, the title to the merchandise or its proceeds to remain in the Woolen Company until fully accounted for, all bills of such consigned goods to be payable to the Woolen Company and accounts of sales to be rendered to that company at least once a month. The Horowitzes were also to give security to protect the Woolen Company from any failure to perform the contract; the profit of the Horowitz firm was to be the difference between the invoice prices and the selling prices of the goods; they were to have seven per cent. discount for payment within four months and any increase in profits by varying the terms of trade was to go to them, and they were to have a drawing account of $1,200 a month, provided the goods sold by them warranted such payment. In 1902, for reasons which do not distinctly appear in the record, the Woolen Company expressed its desire to have the Horowitz firm incorporated, and a corporation was formed under the name and style of The Niagara Woolen Company (which we will designate the "Niagara Company"), for the purpose of contracting and dealing with the Woolen Company and of dealing in fabrics received therefrom. One hundred and ninety-five of the two hundred shares of the Niagara Company were issued to Philip Horowitz, as fully paid up, in consideration of a mortgage by him on certain real estate for $19,500. A contract in writing was entered into by the

terms of which it was agreed that the Woolen Company
would deliver such merchandise to the Niagara Company
as it saw fit and that the Niagara Company would accept
possession of the merchandise upon the following condi-
tions: The Niagara Company should hold and care for the
merchandise as the property of the Woolen Company, the
title thereto or proceeds therefrom being vested in the
latter company and the merchandise being at all times
under its control. The title to the merchandise was to
pass directly from the Woolen Company to the purchaser.
The property was to be insured for the benefit and in the
name of the Woolen Company. The Niagara Company
was to be given the usual discounts allowed by the Woolen
Company and was restricted to the city of Elmira, New
York, and the State of Montana in doing a merchandise
business other than as provided in the contract. The
Niagara Company agreed to execute such other documents
as the Woolen Company deemed advisable to carry out
the agreement, and the Woolen Company had the option
to terminate the agreement upon the breach of any condi-
tion by the Niagara Company. The agreement further
provided:

"IV. Said party of the second part [the Niagara Com-
pany] agrees to sell such merchandise to such persons as
they shall judge to be of good credit and business standing,
and to collect for and in behalf of the party of the first
part [the Woolen Company], all bills and accounts for the
merchandise so sold, and to immediately pay over to the
said party of the first part any amount collected as afore-
said immediately upon its collection, minus, however, the
difference between the price at which said merchandise
so collected for has been invoiced to the party of the second
part and the price at which said merchandise has been sold
as aforesaid by the party of the second part.

"V. Said party of the second part does hereby guarantee
the payment of all bills and accounts for merchandise,

possession of which is delivered to it under this agreement, and it hereby agrees in case any merchandise delivered under the provisions of this agreement by the party of the first part to the party of the second part, is not accounted for to the party of the first part under the provisions of Clause IV, of this agreement, to pay to the party of the first part the invoice price of said merchandise, and thereupon title to said merchandise, or to the proceeds thereof, so paid for shall pass to the party of the second part, and shall then be exempted from the provisions of this agreement.

\*    \*    \*    \*    \*    \*    \*    \*

"VIII. This agreement shall continue for one year. If, for any reason, this agreement terminates, all of the merchandise, possession of which is held by the party of the second part under this agreement, shall at said termination be immediately returned to the possession of the party of the first part."

At the same time an agreement was made by the Woolen Company and Horowitz & Company and one Jeremiah P. Murphy, whereby Horowitz & Company guaranteed the performance of the contract of the Niagara Company, and the Horowitzes, in accordance with the contract, transferred 197 shares of that company's stock to Murphy, who really represented the Woolen Company, in trust, the stock to be voted as the Woolen Company directed, except that so long as the Niagara Company and the Horowitzes performed their agreements the stock should be voted for whomsoever they designated for president of the Niagara Company and should be used in all meetings as though the Horowitzes had control of it, and they were to receive the dividends thereon. Upon breach the stock was to be transferred to the Woolen Company or whomsoever it designated. Horowitz was elected president of the Niagara Company and one of the Woolen Company's employés was made treasurer of the

company: the by-laws of the Niagara Company provided that checks on the funds of the company were to be signed by the president and treasurer jointly. The Niagara Company had an office in part of the premises of Horowitz & Company with a sign on the outside door under that of Horowitz & Company. Afterwards the Woolen Company put in a bookkeeper who kept an account of the goods billed to the Niagara Company and of sales and payments reported by the Horowitzes. The goods were sold in the name of the Niagara Company and until May, 1904, when Philip Horowitz began to embezzle the funds of the Niagara Company by indorsing checks payable to the company for sales made by it and depositing them in his personal account, such funds were deposited in the bank account of the Niagara Company. An amendment to this contract extending it for another year and changing it in respect to discounts, requiring the Niagara Company to make monthly accounts of sales, giving to it a discount of eight per cent. upon all invoices the amounts of which were turned over to the Woolen Company within sixty days after sale by the Niagara Company, and then a further discount of two per cent., but obliging the Niagara Company to pay six per cent. interest on invoices the amounts of which were not turned over to the Woolen Company within sixty days, was made on November 11, 1903; otherwise it continued in force.

On October 26, 1904, a suspicious fire occurred on the premises and Philip Horowitz immediately left the country and has not been heard of since. On or about that date the Woolen Company removed from the premises of Horowitz & Co. 760 pieces of goods which had been consigned to the Niagara Company and for the value of which this suit was brought by the trustee, bankruptcy proceedings having been instituted shortly thereafter.

Both courts found that, whatever the true character of the Niagara Company was, there was no actual fraud

in the transaction. It is quite probable that the Woolen Company desired the method of doing business through the medium of the Niagara Company because it was deemed to be a better legal form and because it wanted to more effectually check up the transactions of the Horowitzes. The opinion of the District Court, as well as the opinion of the Circuit Court of Appeals, shows that the case has been made to turn mainly upon the interpretation of sections four and five of the agreement with the Niagara Company, which, the District Court found, was only another name for the Woolen Company, and which, the Circuit Court of Appeals found, was a sort of cash box for the Woolen Company and a check upon the transactions of Horowitz & Company. We think an examination of sections four and five, when read in connection with section eight, shows most clearly that the Niagara Company was not obliged to pay for goods in its possession and unsold.

By the provisions of section four the party of the second part, the Niagara Company, was obliged to sell to persons adjudged to be of good credit and business standing and to collect for the party of the first part, the Woolen Company, accounts for merchandise sold and immediately pay over to it the amounts collected, less the difference between the price of the merchandise as invoiced to the Niagara Company and the price at which it was sold. In section five of the contract the Niagara Company guaranteed the payment of bills and accounts, and agreed, in case any merchandise delivered was not accounted for *under the provisions of clause four*, to pay to the Woolen Company its invoice price, whereupon title to the merchandise or proceeds thereof was to pass to the Niagara Company and they were to be exempt from the terms of the agreement. That part of section five relating to goods not accounted for refers specifically to the provisions of clause four of the agreement, which deals with goods sold

only. The entire contract must be read to ascertain the
purpose of the parties, and we find in clause eight, limiting
the agreement to one year, the provision that if for any
reason the agreement terminated all of the merchandise,
the possession of which was held by the Niagara Company
under the agreement, should be immediately returned to
the Woolen Company. The District Court held that this
agreement, sections four and five, obligated the Niagara
Company to pay for each and every piece of goods deliv-
ered under the contract with it, but for the reasons we have
stated we cannot agree with this construction. We find
that the agreement was really one of bailment for the pur-
pose of sale, with the right to return the unsold goods.
There is nothing illegal in such contracts when made in
good faith. As this court held in *Sturm* v. *Boker*, 150 U. S.
312, 330, an agency to sell and return the proceeds or the
specific goods stands upon the same footing as a bailment
where the identical article is to be returned in the same
or altered form and title to the property is not changed.
It therefore follows that, if there are no other circum-
stances controlling the situation and establishing that this
contract was a mere cover for a fraudulent or illegal pur-
pose, there is nothing in its terms operating to transfer
the title to the goods to the Niagara Company or to pre-
vent the return of those unsold to the Woolen Company
or their being retaken by that company upon the happen-
ing of the contingency shown in this case.

But it is insisted by the counsel for the appellant that
the conduct of the parties shows that their real purpose
and understanding were to make an effectual sale and
that the writing, even if interpreted to withhold the title
by its terms, was merely a convenient resort to fortify
the right to take the goods in event of disaster overtaking
the Horowitz concern. Some of the most cogent of the
circumstances relied upon will be noticed. It is said that
the Horowitzes selected the goods, whereas under the

contract the Woolen Company had the right to turn over any it saw fit; but this circumstance may be readily explained for the Horowitzes were familiar with and of course interested in their own trade and more likely than anyone else to make proper selections for it, and from the sale of the goods chosen they were to make their profits.

A letter in evidence written in December, 1903, by an agent of the Woolen Company in answer to a request to take back goods contained the statement that the Woolen Company could not at that late date consent to have fall goods made expressly for the Horowitzes and delivered in accordance with the terms of the agreement turned back in the stock. It is true that this circumstance is more consistent with the idea of sale than of bailment, but it had reference to goods which were delivered and evidenced the desire of the Woolen Company to have them sold' under the consignment as the parties intended.

It is urged that the goods were not kept separately, but it appears that the tags of the Woolen Company were left upon the goods and it is not shown that any creditor relied upon mismarking or misbranding. And memoranda are in evidence showing the names of certain salesmen thereon, but on these same bills it is stated that the goods were furnished under the agreement already referred to.

Against these considerations are the positive terms of the agreement, found to be free from fraud and fairly entered into, which as we interpret them permitted goods unsold to be returned. There is the further undisputed fact that until Philip Horowitz began in the spring of 1904 to violate the agreement checks for sales were quite uniformly deposited to the credit of the Niagara Company and the proceeds turned over to the Woolen Company; that the Woolen Company had a bookkeeper in the Horowitz place, who kept account of the goods consigned and sold; that checks were required to be indorsed by Horowitz and

a representative of the Woolen Company, and that an agent of the Woolen Company frequently visited the concern inquiring into the sales and urging prompt collections. The Horowitzes and the Niagara Company were not permitted to keep the proceeds of the sales or to use them for their own benefit, and this was only done through the fraudulent conduct of Philip Horowitz in violation of the agreement and the purpose of the parties.

We are unable to find that this contract was either actually or constructively fraudulent, and hold, as was found in the Circuit Court of Appeals, that it was what it purported to be, a consignment arrangement with the net proceeds of sales to be accounted for to the consignor and with the right to return the unsold goods. Finding no error in the decree of the Circuit Court of Appeals, the same is

*Affirmed.*