UNITED STATES v. GENERAL ELECTRIC CO. et al.

(District Court, N. D. Ohio, E. D.   April 3, 1925.)

No. 1051.

1. Monopolies ⬤⇒17(1)—System of electric manufacturing company in selling patented article direct to consumers, partially through agencies, held not in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

Selling system of electric manufacturing company by direct sales of patented article to ultimate consumers, partially through agencies carrying consigned stock and guaranteeing collectibility of customers' accounts, *held* not in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

2. Monopolies ⬤⇒17(1)—Manufacturer may market product directly and fix sale price.

Manufacturer may market his product directly to ultimate consumers, and fix sale price, and select agencies therefor.

3. Monopolies ⬤⇒17(1)—That manufacturer's system is adequate in size to market product directly does not constitute violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

Building up of a system by manufacturer adequate in size to market his product directly to consumers is not of itself violation of the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

**4. Monopolies ⊜⇒17(1)—License agreement, requiring licensee to observe prices, terms, and conditions of sale of patented article fixed by licensor, held not in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).**

License agreement, requiring licensee to observe prices, terms, and conditions of sale fixed by licensor, *held* not in violation of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), since it only imposes restrictions within field of exclusive monopoly right conferred by patent.

**5. Monopolies ⊜⇒17(1)—Any doubt of legality of selling plan of manufacturer, under which it had operated since 1912 after submission to United States Attorney General, should be resolved in favor of manufacturer (Sherman Anti-Trust Act [Comp. St. § 8820 et seq.]).**

Where manufacturer had operated under selling system since 1912, after submission to United States Attorney General, and Federal Trade Commission had approved thereof in 1920, any doubt as to whether plan was within Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) should be given manufacturer.

**6. Estoppel ⊜⇒62(2)—Government is not estopped from proceeding under Sherman Anti-Trust Act, because of previous decision of Federal Trade Commission (Comp. St. § 8820 et seq.).**

Previous decisions of Federal Trade Commission that selling system of manufacturer was not violative of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) does not estop the government from subsequent proceedings thereunder.

In Equity. Suit by the United States against the General Electric Company and others. Bill dismissed.

Decree affirmed 47 S. Ct. 192, 71 L. Ed. ——.

A. E. Bernsteen, U. S. Atty., of Cleveland, Ohio.

Squire, Sanders & Dempsey, of Cleveland, Ohio (Frederick P. Fish and Charles Neave, both of New York City, of counsel), for General Electric Co.

Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio (Paul D. Cravath and F. Harold Smith, both of New York City, of counsel), for Westinghouse Electric & Mfg. Co. and Westinghouse Lamp Co.

WESTENHAVER, District Judge. This suit is in equity to dissolve an alleged combination and conspiracy organized and maintained by defendants in violation of Act July 2, 1890, and amendments thereto, known as the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.). It has been heard and submitted on an agreed statement of facts, chiefly documentary. Careful study has been given to the respective contentions of counsel, but I deem it unnecessary to prepare an extended opinion. Obviously the case is destined to go higher; hence I shall content myself with a statement only of my conclusions.

The alleged conspiracy began in 1912. It is embodied in written documents, which have been modified since only in immaterial respects. It has to do with the manufacture and sale of incandescent electric lamps having a tungsten filament. The manufacture and sale of these lamps during the entire period has been dominated by underlying patents owned by the General Electric Company. The validity of these patents has been sustained against all infringers, and no one may make or sell this type of lamp except with its permission. It has licensed the Westinghouse Company, the terms of which license is the basis of one of the major grounds relied on to support the charge of an illegal combination. It has also licensed some 13 other manufacturers, whose combined output constitutes less than 10 per cent. of the total product made and sold in the United States; but as to these 13 no complaint is made, and their activities, as well as their relations to the General Electric Company, are not involved in this controversy. Of the incandescent electric lamps made and sold in the United States, approximately 97 per cent. have a tungsten filament, covered by the patents above referred to. In 1923 the General Electric Company had 61 per cent. and the Westinghouse Company 16 per cent. of the total trade in these patented lamps. In prior years the General Electric Company did more; at the beginning of the alleged conspiracy, as much as 80 per cent. of the total.

The General Electric Company adopted in 1912, and has ever since followed, as it contends, the policy of selling its lamps direct to the ultimate consumer. Its selling system was at the same time adopted and has since been followed by the Westinghouse Company. The complaints made of this selling system will be first considered.

[1] Of the General Electric Company's business, what are known as the large lamps constitute 80 per cent. Of its large lamps, 22 per cent. is sold direct to the ultimate consumer by its own salaried employés and delivered direct from its own warehouses; 37 per cent. is sold direct to large consumers on contracts likewise made by its own salaried employés; but deliveries upon these contracts are made from consigned stock in the custody of its agents and under the terms of certain agency contracts of which complaint is made. The remaining 41 per cent. of its large lamps is sold by agents under these agency contracts. Its remaining 20 per cent. of incandescent electric lamp output consists of what

are called small lamps, and are marketed by the same methods; but the larger percentage of small lamps is sold and delivered through agents under the agency contracts in question.

The main point of contention relates to these agency contracts and method of distribution. The facts as they appear in the stipulated documents are too long even to summarize. Counsel agree that the test inquiries are whether the agents or distributors are in fact bona fide agents, whether the consignments of lamps to them are genuine consignments of the manufacturers' product or conditional sales, or whether the title remains in the consignor until sale and delivery is made to the ultimate consumer. All these inquiries must be answered in the affirmative. All the rights and burdens of ownership until sale and delivery are with the consignor. Since 1915, insurance and local taxes have been borne by it. The only noteworthy incident of the relation is that the agent is required to guarantee the collectibility of his customers' accounts and to remit when due, whether collection has been made or not; but these are only the usual and long-familiar incidents of a del credere factor or agent. This conclusion is not only supported, but compelled, by the following authorities: General Electric Co. v. Brower (9 C. C. A.) 221 F. 597, 137 C. C. A. 321; General Elec. Co. v. Commercial Elec. Supply Co. (Mo. App.) 191 S. W. 1106; In re Taft (6 C. C. A.) 133 F. 511, 514, 66 C. C. A. 385; Ludvigh v. Am. Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; Sturm v. Boker, 150 U. S. 312, 330, 14 S. Ct. 99, 37 L. Ed. 1093.

[2] The government's counsel, while conceding the soundness and applicability of the foregoing principles as applied to one or a limited number of agency contracts, contends that the combined system of selling direct and through agents under these contracts is a subterfuge and a sham, whereby the Anti-Trust Law is nullified if not violated. It seems to me that this contention is based merely upon the size and the effectiveness of defendants' system. It must be conceded that a manufacturer may market his product direct to the ultimate consumer. It must also be conceded that he may do this through genuine agents. It must also be conceded that he may fix the price at which he will sell, and may select the agents whom he wishes to represent him, and may fix the price at which these agents may sell the principal's goods. See Federal Trade Commission v. Curtis Publishing Co., 260 U. S. 568, 581, 43 S. Ct. 210, 67 L. Ed. 408; Federal Trade Commission v. Raymond Co., 263 U. S. 565, 573, 44 S. Ct. 162, 68 L. Ed. 448, 30 A. L. R. 1114. These principles being conceded or established, the building up of a system adequate in size to market the product becomes the only ground of criticism, and, in my opinion, is without merit.

[3] The argument that this may not be done is sustained by invoking the principle that a manufacturer may not, after selling or parting with his product, tie up his jobber purchasers and their retail dealers with resale price-fixing agreements. See Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502. But this is quite beside the mark. Counsel's argument is too nebulous to be grasped, but it seems to be this: If the manufacturer, after selling his product, attempts to tie- up jobbers and retailers with price-fixing agreements, it is illegal; if he does not sell his product to jobbers and dealers, but undertakes to market it himself, through his salaried employés or bona fide agents, then, while this may not be per se illegal, it may become so, if his motive is to realize the advantages which he may not lawfully realize by restricting resale prices after he has parted with title. Stated in other words, the argument comes to this: A man wants to get rich; he may not get rich by stealing; ergo, he may not get rich by honest toil, if his motive is to accomplish that which he is forbidden to do by stealing. In law, the motive which moves a man to adopt and follow a course of conduct strictly legal is immaterial, and does not render unlawful that which otherwise would be lawful.

[4] The Westinghouse Lamp Company makes and sells incandescent lamps having a tungsten filament. Its stock is owned by the Westinghouse Electric & Manufacturing Company. For practical purposes there is only one defendant, other than the General Electric Company, and it has been called in the record, for purposes of brevity, the Westinghouse Company. It operates under a license agreement made with the General Electric Company in March, 1912. Its output of incandescent electric lamps having tungsten filament is approximately 16 per cent. of the total made and sold in the United States. It also follows the policy of selling direct to the ultimate consumers, and in so doing has adopted and followed the same agency or consignment system as the General Electric Company. The procedure of selling direct and through agents does not substantially differ. Upon the facts as stipulated, the Westinghouse Company would have no trade, interstate or otherwise, to restrain except for the license agreement. The business which is now said to be illegally restrained owes its contin-

.ued existence, if not its·origin, to that license; otherwise, it would long ago have had to quit business to. avoid infringement, since the dominating patents have.been uniformly sustained by the courts, and all makers not having licenses have been enjoined.

Certain provisions, however, of this license agreement, are criticized and call for comment. The licensee agrees that during the life of the dominating patents it will observe the prices, terms, and conditions of sale fixed and maintained by the licensor, the General Electric Company. It is agreed that the licensee is not bound to adopt the licensor's agency system, but it has in fact adopted it and conformed its business policy thereto. It is further provided that the licensee will not interfere with the licensor's business of selling to consumers through its own salesmen, by offering to allow or allowing greater compensation than the licensor allows, as disclosed by its schedules, and that it will not appoint, as agents, persons or companies disapproved by the licensor as irresponsible. The other provisions of the license are not unusual, except the exaction of.10 per cent. royalty on all sales above 15 per cent. of the total sales of electric lamps having tungsten filaments, and only of 2 per cent. royalty on a total business of 15 per cent. or less. As to this provision, government counsel conceded on the hearing that it is only reasonably necessary to the protection of the business of the owner of the patent.

As regards the license agreement, as distinct from the agency system, the government's case must stand or fall on the proposition that the owner of a valid patent may not exact as a condition of granting a license that the licensee will not sell at a lesser price than that at which the licensor sells. And the solution of this proposition, it seems to me, turns on the question whether such a provision is within the monopoly right conferred by a patent and reasonably necessary to the patentee's protection. If both licensor and licensee are making and selling, it is quite conceivable that the owner of the patent could not safely grant licenses at all on any other terms; otherwise, he would risk having his business destroyed, and hence, as a matter of ordinary business prudence, would feel obliged to keep his patent monopoly wholly within his own hands. And it was so held in Bement v. National Harrow Co., 186 U. S. 70, 22 S. Ct. 747, 46 L. Ed. 1058. And in this respect the authority of this case has always been respected and remains unqualified. See Standard Sanitary Mfg. Co. v. U. S., 226 U. S. 20, 48, 33 S. Ct. 9, 57 L. Ed. 107; Boston

Store Co. v. American Graphophone Co., 246 U. S. 8, 26, 38 S. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447; United States v. United Shoe Mach. Co., 247 U. S. 32, 57–60, 38 S. Ct. 473, 62 L. Ed. 968.

The license in question, it will be observed, imposes restrictions only within the field of the exclusive monopoly right conferred by a patent. That right confers on the patentee an exclusive right to vend, and it is that exclusive right which the license in question protects, and protects it only by imposing restrictions as to price, terms, and conditions of sale, while the right to vend has not yet been exercised by the licensee. No attempt is made to fix or control prices, or to impose restrictions, after the article covered by the patent has. been vended or taken out from under the protection of the patent monopoly. For this reason the series of cases cited and relied on by government counsel is inapplicable. They are Bauer v. O'Donnell, 229 U. S. 1, 33 S. Ct. 616, 57 L. Ed. 1041, 50 L. R. A. (N. S.) 1185, Ann. Cas. 1915A, 150; Straus v. Victor Talking Mach. Co., 243 U. S. 490, 37 S. Ct. 412, 61 L. Ed. 866, L. R. A. 1917E, 1196, Ann. Cas. 1918A, 955; Boston Store v. American Graphophone Co., 246 U. S. 8, 38 S. Ct. 257, 62 L. Ed. 551, Ann. Cas. 1918C, 447; Motion Picture Patents Co. v. Universal Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. After the decision of the Bement Case came the Button Fastener Case (6 C. C. A.) 77 F. 288, 25 C. C. A. 267, 35 L. R. A. 728, which sought to. extend the patentee's monopoly to articles covered by the patent after the patentee had exhausted his entire right to vend, and the foregoing cases merely forbid this extension of the patent monopoly after the patentee has fully exhausted his exclusive right to vend, and has thereby taken the article out from under the patent monopoly and placed it in the ordinary channels of trade. But the fundamental principle of the Bement Case has never been repudiated, but, on the contrary, has always been recognized. It seems to me that the principles recognized and applied in United States v. United Shoe Machinery Co., 247 U. S. 32, 38 S. Ct. 473, 62 L. Ed. 968, compel the conclusion that the charge of an illegal conspiracy is not sustained, and this conclusion is also required by the limited ground upon which the government's case was eventually sustained in United Shoe Machinery Co. v. United States, 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708. See, also, Federal Trade Commission v. Curtis Publishing Co., supra. To avoid future misconception, it should be noted that this hold-

ing is limited to a license in which are found none of the familiar tying restrictions; i. e., covenants that the licensee, or its lessees and vendees, will buy and use unpatented articles, either in producing the licensed article, or in its later use.

[5, 6] If these conclusions were otherwise doubtful, the benefit of the doubt should be given to defendants. The conditions complained of have been in existence since at least March 1, 1912. The agency method of selling, as well as the license agreements in question, were not adopted until after they were submitted to the Attorney General of the United States for his information and consideration. They were neither approved nor disapproved; but defendants' later operations have been only after a full disclosure and during a period of prolonged silence. In 1919 all the matters complained of in the bill were brought to the attention of the Federal Trade Commission. On May 26, 1920, an order was made dismissing the complaint, and the grounds of such dismissal are stated as follows: "The Commission, of course, recognized that your company had the right to prescribe the prices at which its own agents could sell its products, and likewise the right to prescribe prices to be maintained by its licensees as a condition upon which such licensees could sell the articles protected by its patent. As to the charges of exclusive dealing (tying contracts and full-line forcing), and of refusal to sell, these were not supported by the evidence in the record." No complaint is made that defendants offend in the respects stated in the last sentence of this quotation. To be sure, the Federal Trade Commission's decision does not estop the government in this proceeding, but its conclusions correctly summarize the facts as disclosed in this record and accurately state my view of the law.

Such changes in methods of doing business as have been made since 1912 are in favor of freeing rather than restricting interstate trade. Other licenses have been granted, some 13 in all. These other licensees and infringers have acquired a larger share of the total trade, and the trade of the General Electric Company has diminished. It appears that its system is less costly and more economical to the consumer, has improved service to the customer, and has kept prices stationary, if it has not reduced them, in an epoch of rapidly rising prices. If the license agreement is stricken down, it does not free the Westinghouse Company or its business from any illegal restraint; it would leave the General Electric Company in exclusive ownership of the patents, and would authorize, if it did not compel, it to take over the entire business of selling electric lamps having tungsten filaments. This result could be avoided only by depriving the General Electric Company of its patent monopoly, or making a new license agreement between it and the Westinghouse Company, on terms to be fixed by the court, and the right to do either is beyond the power of this court.

The bill will be dismissed for want of equity.