### DRYDEN v. MICHIGAN STATE INDUSTRIES et al.

### In re NICHOLS WIRE, SHEET & HARDWARE CO.

### No. 9644.

Circuit Court of Appeals, Eighth Circuit.
July 20, 1933.

Joseph T. Owens, of Kansas City, Mo. (Maurice H. Winger and Leland Hazard, both of Kansas City, Mo., on the brief), for appellant.

L. L. Watts, of Kansas City, Mo., and Brauer, Bascom & Gerwitz, of St. Louis, Mo., for appellee.

Before STONE and WOODROUGH, Circuit Judges, and MUNGER, District Judge.

STONE, Circuit Judge.

Nichols Wire, Sheet & Hardware Company, being in receivership, the state of Michigan, operating under the name of Michigan State Industries, filed a claim based upon money due on a consignment of binding twine sent to the above company. There is no contest over the amount due. The entire controversy is over giving the claim priority of payment. Priority was urged upon the basis of an equitable lien upon the proceeds coming into the hands of the receiver be-

cause the claim arose from sale of consigned merchandise, and also because the state of Michigan had a statute providing for priority of payment of debts due to it. Upon the former ground, the trial court awarded priority, and from that order this appeal is brought.

Prior to June, 1930, appellee had sold twine to the Nichols Company. In June, 1930, a representative of appellee called upon Frank R. Nichols, president and dominating personality of the company, and sought to sell more twine. Because the company still had on hand some of the twine theretofore purchased and because of the condition of business (occasioned by a severe drouth in that business territory), Mr. Nichols declined to obligate his company further by additional purchases of twine. This situation resulted in a verbal agreement to send further twine upon consignment, allowing the company compensation to consist of the difference between the price for which it must be responsible and the price at which it might sell, together with a 5 per cent. discount upon monthly remittances. In accordance with this arrangement, the company sent to appellee two orders, as shown in the foot note.[1] In compliance with these or-

---

[1] 

| Nichols Wire, Sheet & Hardware Company, Kansas City, Mo. | Purchase Order 9718 |
|---|---|
| To Michigan State Industries | |
| Ship to Nichols Wire, Sheet & Hdwe. Co., | Date 6/13/30 |
| | ................ |
| | Terms |
| Destination Kansas City, Missouri | |
| Date to be shipped........................ | ............... |
| | F. O. B. Consignment |
| Routing C. M. St. P. & Pac. Ry. Co., 1 minimum car 50# bales 8# to the ball | Chicago |
| Binder Twine | |
| ½ to be marked with Farmers Bargain Supply Co. label | |
| ½ to be marked with Michigan State Industries label. | |
| Price per letter of May 8th. | $2400.00 |

| Nichols Wire, Sheet & Hardware Company, Kansas City, Mo. | Purchase Order 9717 |
|---|---|
| To Michigan State Industries | Date 6/13/30 |
| Ship to Nichols Wire, Sheet & Hdwe. Co., | Consignment |
| Destination Joplin, Missouri | |
| Date to be shipped. At once | |
| Routing C. M. St. P. & P. at Chicago, K. C. S. Chicago at K. C. | |
| 1 Minimum carload, 50# bales 8# to the Ball | |
| Binder Twine | |
| Marked with Michigan State Industries label. | |
| Priced per letter of May 8th. | $2400.00 |

ders, the twine was promptly shipped, accompanied by invoices, as shown in the footnote.[2] Thereafter the company sold the twine which it had on hand at the time of the verbal agreement, and thereafter sold the greater part of the consigned shipments before the receivership. The receiver has sold the remainder. The amount of the claim involved here is the balance due upon the consigned twine.

Appellant ably argues here three matters: First, that although the contract contemplated a consignment of the twine to the company, it also intended that relation to change upon the sale of the twine by the company, at which time the bailment was to become a debtor-creditor relation; second, that even though the verbal contract contemplated a continuing consignment without the above change, yet there was an arrangement, subsequent to the shipment of the twine, which changed the relation to that of debtor-creditor; and, third, that no trust fund has been established in the hands of the receiver upon which the priority of the consignor could operate. The appellees present the additional matter that the state of Michigan is entitled to priority as a prerogative of sovereignty and by virtue of legislative enactment.

I. There are many cases involving the problem of whether a particular contract is

---

[2] Michigan State Industries
Jackson, Michigan

Sold To Nichols Wire Sheet & Hdwe Co.
Address 21st & Main Sts—Kansas City, Mo.
Shipped To Same
Address
Shipped From Jackson Michigan
Via..............CM&STP & Pac. Ry. Co.
Our Order No.          Your No. 9718

Invoice No. 58132

Date June 20 1930

Terms 5 PC Monthly Remittances FOB Chicago

| Quantity Shipped—Ordered | Description | Price | Amount |
|---|---|---|---|
| 240 Bales | Farmers Bargain Special Binder Twine— 12000 Lbs 8 Lb Balls | LB 10 3/4 | 1,290.00 |
| 240 Bales | Michigan Binder Twine—12000 lbs 8 lb Balls | LB 10 3/4 | 1,290.00 |
|  |  | Less diff of Frt Jack to K. C. & CHI to K. C. at 12 1/8 cts cwt | 2,580.00 |
|  |  |  | 30.00 |
|  |  |  | 2,550.00 |

On Consignment
Remittances to be made on monthly sales.

---

Michigan State Industries
Jackson, Michigan

Sold To     Nichols Wire, Sheet & Hdwe Co.
Address     Kansas City Mo.
Shipped To  Nichols Wire, Sheet & Hdwe Co.
Address     Davenport Iowa
Shipped From     Jackson Michigan
Via..........Freight Collect
Our Order No.          Your No. 9717

Invoice No. 58180

Date June 23 1930

Terms 5 Pc Monthly Remittances FOB Chicago

| Quantity Shipped—Ordered | Description | Price | Amount |
|---|---|---|---|
| 480 Bales | Michigan Binder Twine—24000 Lbs 8 Lb Balls | LB 10 3/4 | 2,580.00 |
|  |  | Less difference of Frt Jackson to Davenport & Chicago to Davenport at 8½ cts cwt. | 20.40 |
|  |  |  | 2,559.60 |

On Consignment
Remittances to be made on
Monthly Sales.

one of bailment or of sale and from the decisions therein have evolved certain criteria and results useful in determining such questions. An opinion of Judge Booth, for this court, contains a generous citation of cases stating and applying these tests. Marrinan Medical Supply v. Ft. Dodge Serum Co. (C. C. A.) 47 F.(2d) 458, 461. It is often difficult to determine whether a contract is one of sale or of bailment, because "in recent times, the real or supposed needs and exigencies of business and the ingenuity of business men and of their lawyers have evolved a class of contracts which have the earmarks of both sale contracts and factorage contracts." Marrinan Medical Supply v. Ft. Dodge Serum Co., 47 F.(2d) 458, 460 (C. C. A. 8). The essential difference between the two kinds of contracts is the locus of the title. This locus is tested not so much from the standpoint of the sender (bailor or seller) as from that of the receiver (bailee or buyer). The title may remain in the sender but if it is poised for flight into the receiver as soon as he pays the price, it is a sale, even though conditionally so. Sturm v. Boker, 150 U. S. 312, 329, 330, 14 S. Ct. 99, 37 L. Ed. 1093; Laflin & R. Powder Co. v. Burkhardt, 97 U. S. 110, 24 L. Ed. 973; Samson Tire & Rubber Co. v. Eggleston, 45 F.(2d) 502 (C. C. A. 5), certiorari denied 284 U. S. 620, 52 S. Ct. 9, 76 L. Ed. 529; Reliance Shoe Co. v. Manly, 25 F.(2d) 381 (C. C. A. 4); In re U. S. Electrical Supply Co., 2 F.(2d) 378 (D. C. Ill.); In re Wells, 140 F. 752 (D. C. Pa.). But if the title never passes into the receiver, then it cannot be a sale to him. Ludvigh v. Am. Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; Sturm v. Boker, 150 U. S. 312, 329, 330, 14 S. Ct. 99, 37 L. Ed. 1093; Franklin v. Stoughton Wagon Co., 168 F. 857 (C. C. A. 8); Butler Bros. Shoe Co. v. U. S. Rubber Co., 156 F. 1, 5 (C. C. A. 8), certiorari denied 212 U. S. 577, 29 S. Ct. 686, 53 L. Ed. 658; In re Columbus Buggy Co., 143 F. 859 (C. C. A. 8); Metropolitan Nat. Bank v. Benedict Co., 74 F. 182 (C. C. A. 8).

■ In determining such questions, two matters must be borne in mind. First, that "the ordinary or common-law liabilities of a bailee may be enlarged, without destroying the essential character of the contract" [In re Eichengreen (D. C.) 18 F.(2d) 101, 104, affirmed Reliance Shoe Co. v. Manly, 25 F. (2d) 381 (C. C. A. 4); Sturm v. Boker, 150 U. S. 312, 330, 14 S. Ct. 99, 37 L. Ed. 1093; In re Galt, 120 F. 64, 68 (C. C. A. 7)], and consequently too much emphasis should not be put on provisions having that effect only. Second, that a contract may provide for a change in the title locus upon the happening of certain stipulated contingencies or situations. Mitchell Wagon Co. v. Poole, 235 F. 817, 820 (C. C. A. 6); In re Chalmers, 206 F. 143 (D. C. Mont.); Nutter v. Wheeler, Fed. Cas. No. 10,384, 2 Lowell, 346; Ex parte White, L. R. 6 Ch. App. 397.

■ With the general rule as well as the two matters just referred to in mind, we examine the contract here. While appellant does not go quite to the point of admitting there was a bailment at all, yet he places himself on the safer ground that "there was a consignment and hence a bailment until sale by appellant, but upon such sale appellant became a purchaser and hence a debtor for the invoice price of the twine sold to its customers." As to this issue, he argues, first, that certain expressions on the invoices show "appellant became a debtor upon sale of the twine to its customers," and, second, that "the conduct of the parties shows" the same thing.

The statement in the invoices relied upon is "5 P C Monthly Remittances." He construes this as meaning that the bankrupt "had an option to pay the invoice price, for goods sold during the month, at the end of the month, and get a 5% discount, or * * * had the option to pay the invoice price when it got ready (within a reasonable time), but in that event it received no 5% discount." From which it is concluded that "Such an arrangement is compatible only with a debtor-creditor relationship. It is absolutely repugnant to a trust relationship. * * *" In the first place, the invoice is not controlling (Sturm v. Boker, 150 U. S. 312, 328, 14 S. Ct. 99, 37 L. Ed. 1093) where it is in performance of a contract previously made. Here there had been a verbal contract in pursuance of which the orders and invoices resulted. This part of that contract is shown by the evidence to be as follows:

"Q. I notice on these Exhibits, C and D, it states 5% on monthly remittances. A. Yes.

"Q. What do you mean by that? A. My deal with Mr. Nichols on this consignment proposition was that he was to report each and every month on the sales made during the month past, and figure up the cost of the twine sold according to invoice price on which it was billed and to remit to us the amount due us, which would be less the 5% *providing the price was made at such time.*

"Q. On monthly sales? A. Yes." (Italics inserted.)

From this it appears that the discount was to be effective only upon collections realized by the bankrupt, and its purpose evidently is to encourage prompt collections and remittances. A similar discount provision was held by the Supreme Court not to prevent a bailment. Ludvigh v. American Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345.

Appellant contends that if the above statement on the invoices does not necessarily have the above meaning and effect, at least it renders the contract ambiguous, and therefore explainable by extraneous conduct of the parties placing their construction thereon. We doubt if such ambiguity exists but, even so, this court has announced the rule of construction to be that where such a contract is ambiguous the doubt must be resolved in favor of the bailment. In re Smith & Nixon Piano Co. (C. C. A.) 149 F. 111, 112; also, see In re Harris & Bacherig, 214 F. 482 (D. C. M. D. Tenn.) opinion by Sanford, later Mr. Justice Sanford.

Therefore, while appellant properly may enter this issue, it does so with the burden that the conduct of the parties must "either expressly or by necessary inference" (In re Harris & Bacherig, supra, page 482 of 214 F.) establish its position. The first matter insisted on is that the bankrupt could, under the contract, sell at its own price. This alone is not sufficient. Ludvigh v. Am. Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345; In re Columbus Buggy Co., 143 F. 859, 861 (C. C. A. 8); In re Renfro-Wadenstein, 53 F.(2d) 834, 835 (C. C. A. 9). Another matter is that the ledger of appellees shows a "lumping" of these two invoices with money due on the sales made before this consignment agreement into a total item from which was taken the payments made leaving a balance which covered the twine unsold up to the receivership and for which the claim was made. From this it is argued that appellees were willing to accept the Nichols Company as a debtor. Why this action should have effect as a construction of the contract is not quite clear. If it might it is nullified in such result by the same account showing, as to these two invoices, the notation "Consignment Remittances to be made on monthly sales." Another matter thought to affect this situation is that no requirement was made to keep the twine in a separate lot nor the proceeds in a separate bank account. It was not necessary to re- *quire* either, although this twine was, as matter of fact, kept in a separate lot. In McCallum v. Bray-Robinson Clothing Co., 24 F.(2d) 35, 37 (C. C. A. 6), there was a complete mingling of the assigned goods with others; nothing being required in the contract. In various cases the consigned goods have been commingled with others, Hamilton Nat. Bank v. McCallum, 58 F.(2d) 912 (C. C. A. 6), certiorari denied Scott v. Hamilton Nat. Bank, 287 U. S. 619, 53 S. Ct. 19, 77 L. Ed. ——; McCallum v. Bray-Robinson Clothing Co., 24 F.(2d) 35, 37 (C. C. A. 6); In re Klein, 3 F.(2d) 375, 378–379 (C. C. A. 2); In re Taylor, 46 F.(2d) 326 (D. C. Mich.); see, also, Ludvigh v. Am. Woolen Co.; 231 U. S. 522, 529, 34 S. Ct. 161, 58 L. Ed. 345, and in other cases no separate bank accounts have been kept or required. Hamilton Nat. Bank v. McCallum, supra; General Elec. Co. v. Brower, 221 F. 597, 601 (C. C. A. 9); see also, Cable v. Iowa State Sav. Bank, 197 Iowa, 393, 194 N. W. 957, 959, 197 N. W. 434, 31 A. L. R. 748. The final matter suggested is expressions in a letter from appellees (of November 20, 1931) which, contends appellant, "as much or more than any other one thing shows that appellant was a debtor of appellee for the twine which had been sold on the date the receiver was appointed."

This letter was in answer to one written by Nichols which is not in the record. The essential portions are in the footnote.[3] With

---

[3] "Dear Mr. Nichols: It certainly was nice of you to sit down and write such a heart to heart letter about conditions, and I would not say that I am inclined to believe you but I would say that I do believe you. I have been intending to make a western trip for sometime and naturally would call at your office but so far seems as though every day has something new to detain me here at home. However, it won't be long before I will make a trip and perhaps we can then talk things over more definitely in regard to future business.

"Note from your letter that you have a check written up for us for $3,000.00 and that is just about the amount of the check that we have been looking for although we did not know anything positively about what you would send except we figured that you would at least pay that much on the *open consignment account,* and you also state that you are going to release this check at the earliest possible moment. We do not want to break up any calculations that you have in regard to this payment, preferring of course to have this check come to us between now and Dec. 1st, but if that is not in the cards, suggest that you close our *account* in the following manner.

"Make two checks—one for $1,500.00 dated on receipt of this letter, another $1,500.00 check postdated say Dec. 15th to 20th and a note for ninety days, dated Nov. 1st with 6% interest. This would *close the account* and ease up your present conditions as we look at it, and in connection with the note, we would not discount it at our bank but would carry it in your own safe, and you could remit direct for the note when it became due rather than have it go through our bank as well as your own. You may

particular emphasis on the italicized language, appellant contends this letter shows appellees construing the contract as providing that the consignee should become its debtor when the twine was sold to customers. Of course, there are isolated expressions which would fit a relationship of debtor-creditor, but the letter as a whole leaves no such impression as contended for. The letter is just such as might be written either by a consignor or by a seller to a valued customer who was having financial difficulties not due to his own fault. The evidence shows this to be the situation between the parties. Their relations were cordial and frank. The writer of this letter testified that Mr. Nichols was "a good friend of ours and continued to buy more and more twine, and was opening up territory." The opening and closing paragraphs of this letter show the kindly feeling between these men, and also the desire of appellees to maintain friendly relations with a view of future business.

We can find nothing in the action or expression of the parties as above discussed, either separately or combined, to convince that the parties thereby construed this contract as intending a departure or change from the initial consignment relationship.

II. Another contention of appellant is that even if the contract itself contemplated no change from the consignment relation, yet there was a subsequent arrangement which altered that situation and made the consignee a purchaser of all the twine. It is claimed that certain paragraphs of the letter above discussed constituted "an offer to sell to appellant the twine in appellant's warehouse." Without determining we may grant that the letter had such effect. However, the offer was obviously conditioned on certain action on the part of the consignee. That was the sending of two checks for $1,500 each. There was never any compliance with this condition, nor even any prom-

ise to comply, if such promise would have been sufficient as an acceptance of the offer.

III. Appellant argues that there was no proof that appellant (including the consignee as well as the receiver) ever received the proceeds from the sale of the twine, and therefore no establishment of a trust fund as a basis for preferred payment. The evidence shows this was not an active issue. While it was a matter to be proven by appellees, a stipulation covering some of the facts and certain admissions contain what was evidently understood to be proof of this matter. The stipulation speaks of "the proceeds from the sales of the binding twine under consideration" being deposited in certain banks and of an amount (several times larger than this item) coming into the hands of the receiver.

IV. Irrespective of this being a consignment arrangement and even if it were a sale, appellees contend the state is entitled to priority of payment because a statute of Michigan (Comp. Laws Mich. 1929, § 17618) expressly gives the state such priority. In view of the above determination that appellees are entitled to priority because this contract was one of consignment, it is unnecessary to examine this contention.

We think the order must be, and, therefore it is, affirmed.

---

not see this on account of all the twine not having been sold if that is the case, but nevertheless, do it this way and leave it to us to do something in return the following season to adjust matters if it becomes necessary; in other words, we cannot expect you to prepay a consignment account when the commodity is not sold and that is the adjustment that I am referring to.

"Another point I want to bring out is that we aim to have all of our binder twine *accounts receivable* in a closed condition by Dec. 1st with our agencies.

"We are certainly much pleased to know that you are having good luck with our twine, and that you want to continue the connection. Assure you that that is pleasing news indeed. Financial conditions may come and go but a friendly business connection is one that should be continued and we are ready to do our part to make it so." (Italics inserted.)