**SIMS v. TALBERT, State Director, Office of Price Administration, et al.**

**No. 1070.**

District Court, E. D. South Carolina,
Columbia Division.

Dec. 3, 1943.

E. W. Johnson, Jennings L. Thompson, and C. Erskine Daniel, all of Spartanburg, S. C., for petitioner Sims.

Fleming James, Jr., Chief, Litigation Branch, and Lowell J. Grady, Sp. Litigation Atty., both of Washington, D. C., and Chas. B. Elliott, District Enforcement Atty., Carlisle Roberts, Chief Enforcement Atty., and John B. McCutcheon Jr., Enforcement Atty., all of Columbia, S. C., for defendants.

TIMMERMAN, District Judge.

This is a suit to enjoin the enforcement of Suspension Order No. 193–G, issued against the petitioner Sims by an O. P. A. Hearing Commissioner on June 23, 1943, in the proceeding, "In the Matter of Star Oil Company, William Mabry, Manager, J. E. Sims, Owner, Gaffney, South Carolina, Respondent."

The Suspension Order, as it affects the petitioner Sims, provides:

"2. Respondent, J. E. Sims, shall not transfer or deliver or otherwise trade or deal in any rationed petroleum products at said Star Oil Company Service Station."

"3. No person shall in any manner directly or indirectly transfer or deliver any rationed petroleum products to respondent, J. E. Sims, for resale at the said Star Oil Company Service Station."

As was permitted by hereinafter referred to rules and regulations, the petitioner Sims appealed to the O. P. A. Hearing Administrator, who affirmed the said Suspension Order.

Before stating the facts and the conclusions to be drawn therefrom, it is well to point to the Acts of Congress and to the orders, regulations and rules relied on by the Administrative Agency as authority for the hearing had before the Hearing Commissioner and for the Order of Suspension issued in said proceeding against the petitioner, J. E. Sims. The claimed statutory basis for the action taken is to be found in Section 2(a) (2) and (8) of the Act of June 28, 1940 (54 Stat. 676), entitled, "An Act to expedite national defense and for other purposes", as amended by the Act of May 31, 1941 (55 Stat. 236—Priorities and Allocation Act), and Title III of the Second War Powers Act (Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A.Appendix 633), which subsections read as follows:

"Whenever the President is satisfied that the fulfillment of the requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense." Section 2 (a) (2).

"The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency, or officer of the Government as he may direct and in conformity with any rules and regulations which he may prescribe." Section 2(a) (8).

The relevant portion of Ration Order 5C, relating directly to suspension orders, reads: "Sec. 1394.8302. *Suspension Orders.* Any person who violates this Ration Order No. 5C may, by administrative suspension order, be prohibited from receiving any transfers or deliveries of, or selling or using or otherwise disposing of, any gasoline or other rationed product, or facility. Such suspension order shall be issued for such period as in the judgment of the Administrator, or such person as he may designate for such purpose, is necessary or appropriate in the public interest and to promote the national security."

Ration Order 5C is supplemented by Procedural Regulation No. 4 and General Order No. 46. Without quoting either Regulation No. 4 or General Order No. 46, it is sufficient to say that they undertake to establish the procedure for the trial of alleged violators of ration regulations before Hearing Commissioners, with a right of appeal to a Hearing Administrator. The procedure prescribed bears marked similarity to procedure in courts, except that ordinary rules of evidence do not prevail in hearings before a Hearing Commissioner; and it is provided that the determinations made by Hearing Commissioners or Hearing Administrators "shall have the same force and effect as if made, issued or taken by the Administrator".

The facts, about which there seems to be little, if any, difference, are substantially as follows:

The Office of Price Administration, with the approval of the President, promulgated, and authorized and directed the use, of "Form OPA R–545". This form is entitled, "Application and Registration Certificate for Gasoline Dealer or Intermediate Distributor". One of these forms was signed and filed by J. E. Sims on July 22, 1942, as the owner of "Star Oil Co.", doing business at "Gaffney, S. C." The application showed the total capacity of gasoline storage, the amount of gasoline on hand, and the capacity for additional storage at said station. A member of the Ration Board at Gaffney, S. C., signed and issued the registration certificate, but there is nothing on the record offered in evidence to show whether the applicant was certified as a "dealer" or as an "intermediate distributor". There is nothing in the record to fix responsibility for this omission.

As pointed out by the Hearing Administrator in his "Decision on Appeal" an "intermediate distributor" is defined as "any person *other than a licensed distributor* who is *engaged in* the business of *transferring gasoline for resale.* Any such person shall be deemed to be an intermediate distributor *as to each place at which such business is carried on.*" (Emphasis added)

It is also pointed out in the "Decision on Appeal" that a "dealer" is defined as "any person, except a distributor, *who operates a service station,* filling station, garage, store or other place of business *at which gasoline is transferred directly to consumers in the regular course of business* * * *."* (Emphasis added.)

While "Form OPA R–545", referred to above, was introduced in evidence, the Hearing Commissioner made no direct finding as to whether Sims was licensed as a "dealer" or an "intermediate distributor". The Hearing Administrator in his "Decision on Appeal" did say that Sims was not an "intermediate distributor", predicating his ruling on the aforestated definitions. I gather from the argument and the briefs of counsel for the defendants that it is conceded that no case existed against Sims if he was in fact licensed as an "intermediate distributor". The member of the Ration Board who issued the certificate to Sims testified before the Hearing Commissioner, but gave no explanation of the apparent ambiguity in the certificate. Taking the undoubted

facts in this case and applying them to the definitions quoted above, I find it hard to say in which classification the petitioner Sims falls. I rather suspect that the Ration Board at Gaffney, S. C., was also doubtful as to Sims' proper classification and, therefore, gave him a certificate which might apply to one or to the other. In this connection it should be noted that the Hearing Commissioner found as a matter of fact that Mabry acted "as operator and manager of the said Star Oil Company Service Station at Gaffney, South Carolina, during the period" in question, and, as shown above, Ration Order 5C defines a "dealer" as one "who operates a service station, * * * * at which gasoline is transferred directly to consumers in the regular course of business".

The testimony before the Hearing Commissioner shows conclusively, and the Commissioner so found, that William Mabry *operated and was in charge of the filling station at Gaffney, S. C.,* and that he violated Ration Order 5C by selling gasoline without requiring the surrender of ration coupons therefor, by accepting "T" coupons for gasoline delivered to cars bearing "A" or "C" stickers, and by purchasing illegally ration coupons to account for gasoline sold without requiring coupons therefor. It further conclusively appears that Sims lived at Woodruff, S. C., quite a distance from the station in Gaffney operated by Mabry, and that he visited the station once a week, usually on Mondays, to check Mabry's operations for the preceding week. These weekly checks always showed the ration coupons, gasoline, oils and cash in the hands of Mabry to be in balance. Moreover, Sims required Mabry to make daily reports of his operations. There is no suggestion that the daily reports or that the weekly checkings indicated any violation of ration regulations; nor is there anything in the record that raises a suspicion that Sims knew of Mabry's illegal practices. Sims' sworn statement that his understanding with Mabry contemplated that Mabry would obey all ration regulations, and that he thought Mabry was doing so, stands unchallenged in the record.

While there was no written contract entered into between Sims and Mabry, it may be fairly inferred from the record that Sims owned the filling station operated by Mabry; that Sims regularly delivered, or caused to be delivered, to Mabry at said station supplies of gasoline, kerosene and

oils for lawful sale to the consuming public on a commission basis; that Mabry also sold other articles and performed other services at said station for his own account; that Mabry employed and paid his own help, when he had any, Sims exercising no control over them; and that for keeping and selling said supplies so placed in his possession Mabry received commissions of 1¢ a gallon on all gasoline and kerosene sold by him and 5¢ a gallon on all oils so sold, after accounting for the gasoline and other supplies sold and on hand. Additionally Mabry was guaranteed $20 per week, but the guarantee never came into play, as Mabry's commissions were always $40 or more dollars per week. Sims' earnings from said station were from $150 to $200 per month.

Mabry admitted violating ration regulations in the particulars above stated, but testified that Sims knew nothing about said violations. Sims under oath denied any knowledge of Mabry's wrongful conduct and testified that Mabry had agreed to obey all ration regulations, and that he thought Mabry was doing so; and further that Mabry had accounted to him each week for all cash, gasoline, kerosene, oils and coupons that a complete check showed he should account for.

The charge that there was a shortage of 3,700 gallons of gasoline was practically abandoned and little notice need be taken of it. Certainly no finding of a shortage was made by the Hearing Commissioner, and what he did say in regard thereto indicates that he was of the opinion that there was no unexplained shortage of gasoline at the station. As said by the Hearing Administrator in his "Decision on Appeal", "there was a difference of a little over one thousand gallons, less than one-half of 1% of the total gallonage handled, presumably a reasonable shortage explainable by evaporation, shrinkage, etc."

The findings of fact of the Hearing Commissioner, insofar as they relate to Sims, may be summarized as follows:

(a) That Sims was the owner of the Star Oil Company Service Station at Gaffney, S. C., as well as three other service stations located in other towns.

(b) That Mabry was an employee of Sims and operated the Gaffney Station for him, he being paid on a commission basis with a guaranteed weekly income of $20 or more.

(c) "That Mabry made daily reports to J. E. Sims on all gasoline sold, and that he surrendered to Sims all the gasoline coupons he had on hand once each week."

(d) That Mabry turned over "gasoline coupons to the respondent J. E. Sims each week and that there is considerable doubt that the shortage of gasoline and coupons at the said station was as much as 3,711 gallons, taking into consideration the coupons delivered to the respondent J. E. Sims."

(e) "That the respondent J. E. Sims had no actual knowledge of the said violations of Ration Order 5C by the respondent, William Mabry."

Upon these findings of fact the Hearing Commissioner concluded that Sims should be held responsible for the illegal acts of Mabry and accordingly entered the order of suspension hereinabove quoted.

What the Hearing Commissioner did not find should be noted as well as what he did find. He did not find:

(1) That Sims was negligent or careless in supervising Mabry's operations;

(2) That Sims failed to exercise due and reasonable care to see that Mabry lawfully operated said station; or

(3) That Sims was indifferent as to what transpired at said station.

I therefore find and hold the facts to be as aforestated, and that Sims had no guilty knowledge of the misconduct of Mabry in the operation of said filling station; that he had no knowledge of any fact or facts that would have caused a reasonably prudent person in the exercise of due care to have suspected Mabry's wrongful conduct, or any part thereof; that Mabry initiated and effected the misconduct attributed to him in violation of his agreement with Sims to sell said gasoline only in compliance with ration regulations, and contrary to the expectations of Sims; that Sims did not knowingly accept any benefits from Mabry's misconduct; and that Sims did all that a person reasonably could be expected to do to effect observance of all ration regulations at said station.

Section 2(a) (2) of the Act delegated to the President the right to allocate essential materials to the extent necessary in the public interest and to promote national defense. It was within the province of Congress to delegate these powers; and, knowing the great respon-

sibilities resting upon the President in time of war, it was likewise within the province of Congress to authorize the President to exercise the powers conferred through the medium of any department, agency or officer of the government, so long as such department, agency or officer should act in conformity with valid rules and regulations prescribed by the President. Hence Section 2(a) (8) of the Act.

For the purposes hereof it may be assumed that Ration Order 5C, Procedural Regulation No. 4 and General Order No. 46 were within the powers granted, to prescribe rules and regulations to effectuate the general purposes of the act, if such rules and regulations are legitimately interpreted and legitimately administered.

 I think the administrative agency, in the instant case, has overstepped the bounds of legitimate interpretation and administration.

Aside from the concession that no right existed to impose the sanctions that were imposed against the petitioner Sims, if in fact he was an "intermediate distributor", I am of the opinion that the facts in this case show that a bailment for sale existed between Sims, as bailor, and Mabry, as bailee.

"Where goods are consigned to another with the understanding that the consignee shall either sell the property for the consignor and remit to him the price, or, if he does not sell the property, return the same to such consignor, the transaction is not a sale, but a bailment for sale." American Jurisprudence, Vol. 6, p. 170, Sec. 39.

See also Sturm v. Boker, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093; Ludvigh v. American Woolen Co., 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345.

The gasoline here in question was owned by Sims. He delivered the possession thereof to Mabry on the consignment agreement that Mabry would sell the same and account for the proceeds of sale, less his commissions thereon, and also account for any unsold portions of said gasoline so consigned. Mabry had the right to employ his own help, but if he did so he was bound to pay that help, as his sole compensation was to be the commissions agreed upon.

I do not think that the relationship of master and servant existed between Sims and Mabry. This is emphasized by the fact that Mabry did work and traded in commodities other than those consigned to him by Sims for his own account at said station, and by the agreement that Sims and Mabry would bear equally the expenses of fuel, lights and water for the operation of the station.

If I am right in the foregoing conclusion, that the status of master and servant did not exist between Sims and Mabry, but rather one of bailor and bailee, then there is no basis for the application of the doctrine of respondeat superior, which was so vigorously contended for by counsel for the defendants, if indeed that doctrine would apply to the relationship of master and servant in a case of the character now before the court. The doctrine of respondeat superior is peculiarly applicable in tort cases. I think that Mabry's wrong conduct in relation to the consigned gasoline cannot be imputed to Sims, for the reason that "the possession and control of the property bailed had passed from the bailor to the bailee as completely as if there had been a sale."

 "The general doctrine is", as stated in U-Run-It v. Merryman, 154 Va. 467, 153 S.E. 664, at page 666, "that a bailor is not responsible for the acts of his bailee resulting in injuries." There would be less reason to hold a bailor responsible to the public for acts of his bailee when done without his knowledge or acquiescence and in secret violation of an agreement not to do so.

 Furthermore Section 2(a) (5) of the Act provides: "Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

Following the foregoing, Section 2(a) (6) confers jurisdiction to try all offenders against the act or against any lawful rule or regulation issued thereunder, not upon the administrative agency of the act, but upon certain designated courts, among them the District Courts of the United States. It also confers jurisdiction on the courts "of all civil actions under this subsection (a) to enforce any liability or duty created by, or to enjoin any viola-

tion of, this subsection (a) or any rule, regulation, order, or subpena thereunder whether heretofore or hereafter issued."

From the foregoing it clearly appears that Congress intended to and did confer jurisdiction on the courts to try offenders, not only against the act itself, but also against all lawful rules and regulations issued thereunder. Additionally, Congress invested the courts with jurisdiction "to enforce *any* liability or duty created by * * * subsection (a)" of the Act and "to enjoin *any* violation" thereof or "of * * * *any* rule, regulation, order * * * thereunder." The jurisdiction thus conferred on the courts is impliedly if not directly denied to the Administrative Agency.

The inhibitions of the suspension order make the suspension order the equivalent of an injunction. Calling it a "suspension order" rather than an "injunction" does not change its undeniable characteristics.

To say that the administrative agency cannot exercise the power of injunction, even under the assumed name of "suspension order", is not to impede the real functions of the administrative agency. It can get an injunction, if it is entitled to one, just as quickly and effectively—likely more effectively—from a court as from an administratively created Hearing Commissioner. By following the procedure outlined in the act, and as here construed, all questions concerning the delegation of judicial power to a purely administrative agency will be eliminated; and why should not such question be eliminated, if it is desirable to maintain the integrity of the Constitution and keep the several departments of government separate and distinct.

Even if it be assumed that the Hearing Commissioner had the power, upon a proper showing, to issue the suspension order or injunction in question—call it by whatever name you may—I cannot agree that a proper showing therefor was made in the instant case. The record in the case shows that Sims did not commit, connive at, profit by or know of the violations of Mabry; and furthermore that Sims did all that reasonably could be expected under the circumstances to insure Mabry's compliance with the gasoline ration regulations. There was no substantial evidence, or even findings of a substantial character, warranting the issuance of the suspension order against Sims.

Courts cannot punish citizens for wrongs they do not commit. Why then should administrative agencies be allowed to do so? Counsel for the defendants answer, that the suspension order is not punitive in character, that it is only administrative. It is pure fiction to say that the suspension order is not punitive as to Sims. It deprives him of the right to earn from $150 to $200 during the period of suspension, leaving out of consideration the baneful effects on his business that will naturally flow from the suspension. The suspension order does not curtail the distribution of gasoline; it only sends Sims' customers to other filling stations to purchase their requirements of gasoline. The allocation of gasoline is not affected in the slightest by the order; it will not conserve one ounce of it. All the order amounts to is to punish Sims for the wrongs of Mabry. The citizens of this country have a right to appeal to the courts for protection against such tyranny.

I think the order of injunction should be granted, and I will sign such an order upon presentation in proper form.