## In re M. J. HOEY & CO.

## Ex parte NORWEGIAN AMERICAN SECURITIES CORPORATION.

Circuit Court of Appeals, Second Circuit. May 9, 1927.

No. 276.

1. Courts ⊘406(1¼)—Lower court findings, after confirming commissioner's report, will not be reversed, unless clearly wrong.

Circuit Court of Appeals, before reversing findings made in lower court after confirming commissioner's report, would have to be well satisfied that they were clearly wrong, particularly where all documentary evidence looks one way.

2. Fraudulent conveyances ⊘142—Agreement of owner of Stock Exchange seat, liable under rules for owner's debts to fellow members, to hold seat on trust for lender of purchase price, held void, as permitting owner to waste security.

Agreement of owner of Stock Exchange seat to hold it on trust for one who loaned him purchase price *held* void, as reserving to owner power to waste security, where under Exchange rules seat stands as security for debts to fellow members.

3. Exchanges ⊘7—Agreement to hold Stock Exchange seat for repayment of money held void as against creditors, under rules of Exchange against incumbrances.

Agreement by owner of Stock Exchange seat to hold seat in interest of another for repayment of money *held* unlawful and void as against creditors, in view of rule of Exchange requiring members to own seats free and clear, and providing that seat stood as security for debts to other members, since customers had every warrant for assuming that member would in good faith abide by rules.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the bankruptcy of M. J. Hoey & Co. From an order dismissing the claim of the Norwegian American Securities Corporation against Henry H. Kaufmann, trustee, claimant appeals. Affirmed.

Appeal from an order in bankruptcy of the District Court for the Southern District of New York, confirming the report of a special commissioner, and dismissing the petition of the claimant against the trustee. The subject of the petition was the net proceeds from the sale of a seat on the New York Stock Exchange, after the owner's debts to members had been paid.

The petition alleged a contract between one Barth, the claimant's president, and Hoey, one of the bankrupts, by which they were to form a partnership as stockbrokers. Barth was to lend, and did lend, Hoey $55,000 to buy a seat on the Exchange, to be used in the business. Hoey was to hold the seat upon a trust for Barth, to repay him the loan, and share equally with him any surplus resulting from its sale. Later Barth assigned to the claimant all his interest in the firm and the seat. The partners got into financial straits, to extricate them from which the claimant was from time to time forced to lend them or get for them further money, and at the time of these added loans Hoey agreed to hold the seat on a trust for the claimant, until he should repay a sum, eventually amounting to $400,000, this being apparently the total of the advances. Shortly before the bankruptcy the seat was sold, and the receiver, and in succession to him the trustee, received so much of the proceeds as the Exchange did not find necessary to pay Hoey's debts to members, who under its rules had a prior lien upon it. This residue was the sum in controversy.

The proof took a very wide range, not necessary to set forth, and presented a sharp conflict of testimony, which the special commissioner resolved in the trustee's favor, holding that Hoey had made none of the agree-

ments attributed to him. As required by the Exchange, Barth had given Hoey a release of any claim arising from his advance to pay for the seat, and Hoey's successive articles of partnership (of which there were a number, because the personnel of the firm was constantly changing) all declared that the seat was his. The firms always printed on their letter heads, on their bought or sold notes, and on the office door, that they were members of the New York Stock Exchange, whose rules require all members to own their own seats free and clear.

T. Langland Thompson, of New York City (Lindsay D. Holmes, of New York City, on the brief), for appellant.

Rosenberg & Ball, of New York City (Chandler Bennitt and Ralph F. Colin, both of New York City, on the brief), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1] We do not find it necessary to re-examine the findings made in the court below. After confirmation by the District Judge of the commissioner's report, we should in any event have to be well satisfied that they were wrong before we reversed them, Brookheim v. Greenbaum, 225 F. 763 (C. C. A. 2), and this is especially true where all the documentary evidence looks one way. In such a case, where one party asserts that what both have solemnly and repeatedly declared, they did not mean at all, he bears a heavy burden of proof, Atwater v. Guernsey, 254 U. S. 423, 41 S. Ct. 150, 65 L. Ed. 339. However, even if we should conclude that the claimant's version was true, it would not change the result. We are not concerned with the validity of such a trust as between the parties; this dispute is between the supposed cestui que trust and the trustee's creditors, and while ordinarily in such a case the cestui que trust will win, there appear to us to be circumstances here which take the case out of the general rule.

[2, 3] The petition in divisions V, Y, and A A of article IX, alleges that before the bankruptcy Hoey had agreed to hold the seat in the claimant's interest until he should repay four hundred thousand dollars. Therefore, whatever the original arrangement with Barth as to any surplus over $55,000, it had long since disappeared, and the relation had become altogether one of security, call it mortgage, equitable lien, or what one will. This being so, the situation falls within the doctrine of Benedict v. Ratner, 268 U. S. 353, 45

S. Ct. 566, 69 L. Ed. 991, though not for the reasons urged by the trustee. That case, following the New York law, decided that when a lender gave leave to a borrower to use the security for the borrower's own needs without reducing the debt pro tanto, or substituting equivalent funds, that stipulation vitiated the whole transaction. This was quite independent of any credit which the borrower might get with others on the faith of his apparent ownership. The case involved only choses in action, and there could be no such element in it. The borrower's privilege to waste the res was alone enough to invalidate the security, either because of the repugnancy between the grant and the reserved power, or for whatever the reason may be. At any rate the transaction was held unconditionally a fraud.

That was the case of an assignment to the lender of a number of accounts, permission being given the borrower to collect and use the proceeds in his business, so that the lender remained secured in case of insolvency only by what the borrower might leave. Here the res was a single and indivisible piece of property, of which the borrower could not dispose piecemeal, and which he was not authorized to sell as a whole. So far the cases are therefore different, and Benedict v. Ratner does not apply, because the borrower's mere power to convey counts for nothing, except as expressly granted by the lender. The trustee has misapprehended the decision in this respect. The similarity between the cases rests in the character of the seat as property, in that under the rules of the Exchange it stands as security for the owner's debts to fellow members. From this it follows that the owner has it in his power through his dealings with other members to encumber the seat as he will, and at pleasure to reduce the surplus which alone is available to a putative lienor. All this was entirely well known to Barth and the claimant, who indeed executed the release and the several sets of articles for the very purpose of allowing Hoey to do exactly this. It appears to us a matter of indifference whether the res be made up of separate parcels, of which the borrower may dispose in detail, or whether it be a single thing whose value he has leave to diminish at his pleasure. Whatever be the basis of the doctrine, it can make no difference how the power granted is exercised, when the result is in substance the same. The supposed lien here, just as in Benedict v. Ratner, was to be imposed only on the rump which the borrower might leave. That made the transaction unlawful.

If, however, we are wrong in so understanding that decision, there is another path which comes out at the same spot. Barth and

the claimant were entirely aware of the use to which Hoey put the seat; they meant him to represent to all his customers, exactly as he did, that he was a member of the Exchange. So far as those customers knew that the rules required members to own their seats free and clear, the secret trust was as plain a fraud as to them as its assertion would have been against the Exchange itself in the teeth of the release. Such customers had every warrant for assuming that a member would in good faith abide by the rules. The claimant and Barth must have known of the likelihood that there would be such customers, and the trust was pro tanto reasonably calculated to defraud. Perhaps that alone is enough. But as to Hoey's other customers we think it also contemplated a fraud. All customers of a broker must understand at least that he has power himself to execute their orders on any exchange of which he declares himself a member. Are they charged with notice that though a member he may have kept only the shell and eaten the kernel? The property is not a chattel, where possession can be divorced from ownership. Ludvigh v. American Woolen Co., 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345. It is not property whose ownership may be kept from the knowledge of customers, like securities in a vault. Sexton v. Kessler, 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995. Rather it is advertised as property allocated to the business as completely as can be. To charge customers with notice of the chance that only the shadow remains in the broker's hands seems to us quite unwarranted. In the first place we have no reason to suppose that any such practice actually obtains in the face of the Exchange's own rules. In the second, if we had, we should have no right to impute knowledge of it to customers generally. And therefore we say that when a secret lienor actively assists a broker to spread broadcast among his customers the fact of his membership, he shares in misleading them and takes part in an attempted fraud upon them.

If so, the express trust was unlawful and void, In re Great Berlin Steamboat Co., L. R. 26 Ch. Div. 616 (C. C. A. 1884). It might be that as between the parties, a resulting trust against the broker should be raised to prevent the injustice of allowing him to keep the spoil. On that we need not pass, because here the creditors were of course not implicated in the deceit, but rather its intended, even if not its actual, victims. The title having come to their trustee, we can see no reason for equity to raise a resulting trust against them, these being the mere creations of equity to prevent injustice. It is apparent, therefore, that we

need not inquire whether all of Hoey's creditors in fact relied upon the fact of his membership, though there is every likelihood that all of them did who dealt with him as a broker at all. If it were necessary we should be disposed to say that the trustee was entitled to a presumption that they had, and that the claimant must put in some proof that they had not. On that we do not, however, rest; it is enough that the express trust was for an unlawful purpose, and that the equitable considerations are not at hand which raise a resulting trust ex æquo et bono.

Order affirmed.