## EDWARDS v. STERLING NAT. BANK & TRUST CO.

District Court, S. D. New York.
Jan. 29, 1934.

Maxwell S. Mattuck, of New York City, for plaintiff.

Glass & Lynch, of New York City (Leslie Kirsch and Sydney W. Cable, both of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

My judgment is that the complaint should be dismissed without costs.

I. The situation involved in this case goes back to August 13, 1931, when what is called a financial statement contract was entered into by the defendant bank and the M & M Manufacturing Company, Inc., of which the plaintiff is a trustee in bankruptcy.

This contract, so far as it is material, reads as follows (italics mine):

"The undersigned (called Borrower) to procure credit or loans from time to time from Sterling National Bank & Trust Company (called Bank) on negotiable paper or otherwise hereby furnishes Bank with the following full and true Financial Statement as of July 31, 1931, knowing that Bank relies hereon and (unless written notice of change is given as hereinafter set forth) will continue to rely hereon in the making of such loans or giving of such credit. In consideration thereof the undersigned agrees: This statement shall be considered continuing as true unless written notice of change is given; written notice of any material change will be given immediately; proper, accurate and up-to-date books of account will be kept by Borrower and upon request all or any thereof will be produced for examination by Bank with the right to copy them; Borrower's accountant shall promptly comply with all of Bank's requests from time to time for such information and for the inspection of such statements and papers·as he may have concerning Borrower (whether same be confidential or not); if Borrower, or any party primarily or secondarily liable to Bank for any of Borrower's obligations, should fail, become insolvent, commit an act of or file a petition in bankruptcy, make an assignment for the benefit of creditors, or if the Borrower shall fail to notify the Bank of any material change, or to produce on request any books called for or to permit the examination thereof, or if Borrower's accountant fail or refuse to comply with Bank's request for information and inspection as above provided, or if a judgment shall be rendered, or warrant of attachment issued, or a petition in bankruptcy filed, against Borrower or any of such parties as in Bank's opinion shall increase its risk in the premises, or *if Borrower assign any account or accounts,* or if a Receiver be appointed for Borrower or any of such other parties, or if any statements herein be untrue or if Borrower at any time fails to comply with the terms hereof, or if Borrower or any of such other parties fail to pay

any obligation owing to Bank, *then and in any such event Borrower's obligations to Bank whether the same be direct, indirect or contingent, matured or unmatured, shall become immediately due and payable, without notice or demand, and Borrower shall pay the same.* In addition to all other remedies it may have, Bank is hereby given a continuing lien upon all Borrower's property, funds and deposits with Bank, for·the payment of any ·and all obligations of Borrower to Bank, whether direct, indirect or contingent, matured or unmatured, which lien shall not be deemed to have been waived as to the Balance of Borrower's property, funds and de-·posits by the failure to exercise same as to any part thereof, and upon the occurrence of any of the events enumerated in the preceding sentence, Bank may apply said property, funds and deposits against any or all of Borrower's said obligations to Bank. Until Borrower shall give Bank a new statement or notice in writing to the contrary, this statement shall be regarded as a representation and warranty on each occasion Bank shall extend credit or make or renew loan to Borrower that the following statement is on each such occasion true and specifically made and repeated for the purpose of procuring from Bank on the faith thereof such credit or loan or renewal of loan, and that on each such occasion the actual net worth of Borrower is no less than that shown on the following statement, and notwithstanding the receipt of such notice or of a new statement (except a statement on Bank's form) on each such occasion the foregoing rights and remedies of Bank shall be read into and become part of said obligations of Borrower."

The details of borrower's financial statement were then inserted and the contract continued thus:

"We have not hypothecated any of our Accounts Receivable or Merchandise and should we do so at any future time, we agree to notify you immediately. We know of our own knowledge and not from information imparted by our bookkeeper or any other person, that the foregoing statement is correct and that our condition today is as good as when above inventory was taken, and that we have since then sustained no serious loss through either bad debts, depreciation in our merchandise, or otherwise. The undersigned has read both sides of this statement and expressly represents that all the facts and figures mentioned therein are within the personal knowledge of the undersigned.

"Name of Corporation:
"M. & M. Manufacturing Co. Inc.
"By Simon Millberg, Pres., Officer.
"Date Signed:
"New York City, N. Y. 8/13/1931."

On March 10, 1932, there were outstanding two notes, each for $5,000, due respectively March 17, 1932, and April 28, 1932, owed by the M & M Manufacturing Company, Inc., to the bank and indorsed individually by one Simon Milberg,· the president of the said company.

On that date a check was offered by the M & M·Manufacturing Company, Inc., for deposit to its account in the sum of $9,812.54. It was called to the attention of one of the vice presidents of the bank and he observed that, although it was apparently a corporate check, the name of the corporation did not appear over the signatures of two officers in the place arranged for the signature of the drawer of the check.

The check was drawn on the County Trust Company, and the said vice president called up the County Trust Company and was told that they would honor the check, whereupon he had it certified.

The M .& M Manufacturing Company, Inc., then had on deposit with the Sterling National Bank & Trust Company the sum of $12,387.26, deposited in ordinary course and exclusive of deposits of $10,692.29 made that day.

After the check above mentioned was certified, the vice president called up Mr. Milberg of the M & M Manufacturing Company, Inc., and told him that he had found out through the County Trust Company that the check was the check of the Finance Corporation of America and that he believed that Mr. Milberg was assigning the receivables of the M & M Manufacturing Company, Inc.; that he, therefore, was going to exercise his right under the contract above noted to accelerate the due dates of the two then outstanding notes for $5,000 each and charge them against the account. Mr. Milberg apparently expressed some doubts as to the bank's power to do this and was invited to come in the next day to see the contract which he had signed. When he did so, he agreed that apparently the bank was within its rights. Whether that is so is the question which we have here to decide.

II. Between August 13, 1931, and March 10, 1932, I find that there was no ground whatever for imputing any knowledge to the

defendant bank of any insolvency or doubtful condition of the M & M Manufacturing Company, Inc.

The reports as to it from credit associations, were uniformly good, and its bank account was maintained at a ratio vis-a-vis loans which was satisfactory to the bank, indeed, at a proportion far above the ratio regularly required by New York banks.

On March 3d, only seven days before March 10th, there was a report from the National Credit Office as to the condition of the M & M Manufacturing Company, Inc., stating that its line of credit of $5,000 was recommended for continuance. Indeed, on these excellent reports to the bank on March 11th, when Mr. Milberg came in to see the vice president, there was a suggestion made as to the continuance of their hitherto pleasant relations as soon as Mr. Milberg had cleared up the question of the assignment which he had made of the accounts receivable and had furnished a new financial statement.

The fact was, however, that on March 10, 1932, the M & M Manufacturing Company, Inc., was hopelessly insolvent.

III. The essence of the claim on the part of the plaintiff, whose case has been argued with a great deal of ability, both in the analysis of the facts and the discussion of the law, is that the financial statement contract with the depositor, which is the background of the whole situation in this case, was invalid because it looked forward to action by accelerating any debts due from the depositor to the bank in a situation which would make the creditor uneasy; that is, the plaintiff has claimed that an assignment of receivables should put the creditor on inquiry.

IV. I do not find myself entirely in agreement with this theory.

I do not think that the assignment of receivables would be such a signal to a creditor that would necessarily put him on inquiry as to the solvency or insolvency of the debtor, but it was one of the stipulated events of default on which debts could be accelerated, as provided for in the financial statement contract above mentioned.

That provision was an instance of foresight by the bank, and as to it I hold that the bank was in a position as a lending bank to lend on such terms as it deemed advisable. It was in a zone of free contract when it made the contract under discussion.

Indeed, so far as New York state, wherein the contract was made, is concerned, the general principle of accelerating accounts in certain contingencies is recognized by the Debtor and Creditor Law (Consol. Laws, c. 12), § 151, which became effective April 6, 1927, long before this contract was made, and the contract must be deemed to be in accordance with the public policy of the state wherein it was made.

The New York statute reads as follows:

"§ 151. *Right of set off against unmatured debts.* Every debtor shall have the right upon the filing of a petition in bankruptcy by or against; or the making of an assignment for the benefit of creditors by; or the application for the appointment, or the appointment, of any receiver of, or of any of the property of; or the issuance of any warrant of attachment against any of the property of a creditor to set off and apply against any indebtedness, whether matured or unmatured, of such creditor to such debtor, any amount owing from such debtor to such creditor, at or at any time after, the happening of any of the above mentioned events, and the aforesaid right of set off may be exercised by such debtor against such creditor or against any trustee in bankruptcy, assignee for the benefit of creditors, receiver or attachment creditor of such creditor, or against anyone claiming through such creditor or such trustee in bankruptcy, assignee for the benefit of creditors, receiver or attachment creditor, notwithstanding the fact that such right of set off shall not have been exercised by such debtor prior to the service upon such debtor of notice of the filing of any petition in bankruptcy by or against, or of the making of any assignment for the benefit of creditors by, or of the application for the appointment, or of the appointment of any receiver of or of any of the property of, such creditor or the service upon such debtor of any warrant of attachment against the property of such creditor."

This statute mentions substantially all the events of default which are mentioned in the contract between the bank and the M & M Manufacturing Company, Inc., with the exception of the assignment of receivables.

That is an event of default which, it seems to me, the bank had a perfect right to put in because, necessarily, its agreement with its depositor to make loans to it was predicated on its maintaining its business as a going concern by keeping its receivables in its own hands and not discounting them at large percentages with loan companies.

So far as I know there have not been any decisions either in the federal courts or in the New York state courts which deal with the inclusion in a financial statement contract,

as here, of an event of default not enumerated in the New York statute, but it seems to me, as I have stated, that the bank and its depositor were in a zone of free contract and that such a financial statement contract might very well be supported even in the absence of a provision similar to section 151 of the New York Debtor and Creditor Law.

There is, however, in the state court an unreported decision of the Appellate Term of the Supreme Court for the First Department, filed March 10, 1932, in which that court reversed the decision of the Municipal Court of the borough of Manhattan, Fifth District, which is reported as Samuels, Receiver, v. Public National Bank & Trust Co. of New York, 140 Misc. 744, 251 N. Y. S. 671.

In that case the Municipal Court had refused to allow a bank to accelerate the due date of certain notes, vis-a-vis a receiver appointed in supplementary proceedings, although section 151 of the Debtor and Creditor Law was then in effect and the bank had a financial statement contract, similar in effect to the contract here, which contained the provision that the appointment of a receiver should be the basis for the acceleration of unmatured paper. The Appellate Term, in reversing the Municipal Court in a per curiam opinion, said:

"By virtue of the provisions of the agreement between the bank and its depositor, as well as the right given to the bank under section 151 of the Debtor and Creditor Law, the bank was justified in applying the credit balance of the judgment debtor toward the payment of his unmatured indebtedness to the bank."

The significant part of that opinion is the emphasis put by the three justices who sat in the Appellate Term on the contractual nature of the right. They did not rely on the statute only and, although confessedly, the event of default herein involved is not a statutory event of default, it was a contractual event of default and I rely, in my decision, on its validity in such a contract.

V. Both in Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 691, and In re M. J. Hoey & Co. (C. C. A.) 19 F.(2d) 764, there was a proposed pledge of a res—in the first case receivables, and in the second a seat on the New York Stock Exchange. In each case the res was by reason of its nature, subject to diminution in value; in the first case by the payment off of the receivables, and the second by the creation of debts from the owner of the Stock Exchange seat to other members of the Stock Exchange. In the Ratner Case the borrower was allowed to collect his receivables without accounting for them, and in the Hoey Case the owner of the Stock Exchange seat did not have to maintain his seat free of the members' claims above referred to; and the courts held in each case, as I understand it, that the difficulty therein was that the *dominion* over the alleged pledged res was left with the pledgor and was not in the hands of the pledgee, and, consequently, the pledges never really achieved the intended juridical status of pledges and so were without value. In other words, that a lien might only impinge and adhere to a res which was arranged to be maintained with a certain stability, and which could not be dissipated at the pledgee's discretion.

But the present case, as I understand it, is not a case of an attempt to create a lien on the bankrupt's bank account. This is a case of a contract by which the bank agreed to give credits to the bankrupt only in consideration of the bankrupt surrendering certain rights, inter alia—and sufficient for this case—the right to await the due date of his commercial paper before being called on to pay. There was not a lien on the bank account of the bankrupt. The bank account was merely a debt of the bank to the bankrupt and I am unable to perceive how, with any proper use of the term, a bank might have a lien on an obligation which it owed. Being subject to increase and decrease by withdrawals and deposits, the bank account was merely, for whatever was in it, a means, on the happening of an event of default enumerated in the contract above referred to, of liquidating, in whole or in part, depending on its quantum, the obligation owed by the bankrupt to the bank. It was properly speaking not a security for payment, but an opportunity of securing payment.

Therefore, the question reserved in Kolkman v. Manufacturers' Trust Co. (C. C. A. 2) 27 F.(2d) 659, at page 662, must be answered in this case against the trustee in bankruptcy.