CRADDICK DEVELOPMENT INC., an American Samoa Corp.,
EDGAR C. CRADDICK, DAVID CRADDICK,
ADMINISTRATOR OF THE ESTATE OF DOUGLAS C.
CRADDICK, and ROBERT KERLEY, Plaintiffs

v.

MAGDALENE VAIVAO CRADDICK  and DOES 1-20 inclusive,
Defendants.

High Court of American Samoa
Trial Division

CA No. 43-89

June 27, 1995

Before RICHMOND, Associate Justice, TAUANU`U, Chief Associate Judge, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, William H. Reardon
For Defendant, Togiola T.A. Tulafono

Opinion and Order:

This case tests the legality of two trusts which, for a limited time, vested legal title to individually owned land in a Samoan with equitable title in non-Samoan beneficiaries.

## FACTS

The two trusts attempted to comply with American Samoa's law prohibiting the alienation of land to non-Samoans by vesting legal title in a Samoan trustee for the benefit of non-Samoans.

In 1980, the Appellate Division of this court upheld a decision of the Territorial Registrar, refusing to register individually owned land to Douglas Craddick ("Douglas") and defendant Magdalene Craddick ("Magdalene") for the reason that Douglas is a non-Samoan and, therefore, prohibited from acquiring an interest in land. *Craddick v. Territorial Registrar*, 1 A.S.R.2d 10 (App. Div. 1980) ("*Craddick I*").

In 1981, responding to *Craddick I*, Douglas, Magdalene and L. Su`eseu`e Lutu ("Lutu") formed Craddick Development Inc. ("CDI"). Douglas provided funds to purchase in Magdalene's name individually owned land in Tafuna and place these lands in trust ("CDI trust"). Lutu, a Samoan, and eventually Magdalene, also a Samoan, as his successor, held the title to these lands as the trustee initially for the benefit of either Douglas alone or Douglas and CDI's other original directors and Robert Anderson collectively and later CDI. A second trust ("the Anderson trust") named Magdalene trustee for the benefit of CDI and Robert Kerley in his capacity as trustee for Anderson's Employee Benefit Plan. These two trusts were limited to a 20-year period.

Although Douglas died on February 18, 1986, the trusts continued to operate until February 12, 1988, when Magdalene attempted to cancel the trusts and claim clear title to all remaining trust lands. Plaintiffs brought this action in 1989, asking this court to order Magdalene to reimburse misappropriated trust funds, and to either remove Magdalene as trustee or compel her performance of the trusteeship according to its terms.

Magdalene counterclaimed, asking the court to declare the trusts void, award her clear title to all remaining trust property, and require plaintiffs to pay her for trust lands already sold, or if the trusts are declared valid, to pay her for outstanding trustee's fees.

## DISCUSSION

■ The result in this case is determined by the reach of American Samoa law restricting transfers in land. The Revised Constitution of American Samoa envisions vigorous constitutional and statutory protection for Samoan ownership of land.

> It shall be the policy of the Government of American Samoa to *protect persons of Samoan ancestry against alienation of their lands* and the destruction of the Samoan way of life and language, contrary to their best interests. Such *legislation as may be necessary may be enacted to protect the lands*, customs, culture, and traditional Samoan family organization of persons of Samoan ancestry, and to encourage business enterprises by such persons. *No change in the law respecting alienation or transfer of land or any interest therein, shall be effective unless the same be approved by two successive legislatures by a two-thirds vote of the entire membership of each house and by the Governor.*

REV. CONST. AM. SAMOA, art. I § 3 (emphasis added); *see also id.* at art. II § 9. The foregoing section of the Constitution contains three sentences. One sentence is directive, one is permissive, and one is prohibitive. All three sentences contain language protecting Samoan lands from alienation.

The first sentence directs that the policy of the government shall be the protection of Samoans against alienation of their lands among other things. This directive language is useful as a rule of statutory construction. We may apply it to interpret the intent of existing policy as vigorously protective of Samoan lands and culture, or to strike down legislation that manifests an intention which is plainly contrary to this purpose. The second sentence is permissive, giving the Legislature the authority to enact legislation to protect Samoan lands and other elements of Samoan culture.

■ The third sentence is prohibitive, preventing the alteration of land alienation laws until overwhelming political tests have been satisfied. By providing substantial constitutional protection to the existing land alienation laws, the framers elevated the language of those laws near to the

119

level of the Constitution itself. Legislatively reversing any court decision which interprets the land alienation laws would require consensus similar to that required for a constitutional amendment. For this reason, we must be extraordinarily careful to avoid subjugating the language of the statute to our own wisdom through expansive interpretations or judicially created exceptions to the law. Put simply, the prohibitive clause of section 3 requires that the land alienation laws be changed by specific political procedures, and not by judicial fiat.

## I. Validity of the Trusts

■ The ultimate result in this case depends on the interpretation of American Samoa's land alienation laws.[1] A.S.C.A. § 37.0204(b) sets forth the relevant prohibition as follows: "It is prohibited to alienate any lands except freehold lands to any person that has less than one-half native blood . . . ."

The foregoing restriction applies to individually owned land by its language encompassing "any lands except freehold lands." *Id*. This application was judicially recognized in *Craddick I*.

The question of whether trust arrangements constitute an illegal "alienation," is one of first impression in this court. Black's Law Dictionary, 5th ed., p. 66 (1979), provides a common law definition of "alienation": "In real property law, the transfer of property and possession of lands, tenements, or other things, from one person to another. The term is particularly applied to *absolute conveyances of real property*. The voluntary and *complete transfer from one person to another* . . . ." (emphasis added; citations omitted).

According to a narrow common law reading, "alienation" means an absolute or complete conveyance. In this jurisdiction, however, a statutory definition supplants the common law. "Alienation" means the sale, gifts, exchange, *or any other method of disposal of property*. A.S.C.A. § 37.0201(a) (emphasis added).

■ We hold that "any other method" includes conveyance of a beneficial interest in trust or the conveyance of other partial interests in land. This view is strengthened by A.S.C.A. § 37.0205, which explicitly provides

---

[1]    Neither party asserts that the trusts fail because they do not meet the traditional requirements of a valid trust. A trust is still invalid, however, when it contravenes law or public policy. *Shelley v. Shelley*, 354 P.2d 282, 285 (Or. 1960).

that "[t]his regulation [restricting the alienation of land] shall not apply . . ." to a trust for mixed-race couples or descendants as beneficiaries. This language exempts one specific type of trust, from the general prohibition. The statement that the restriction "does not apply" to one type of trust indicates that the restriction does apply to other trusts.

Judge Learned Hand, writing for the Second Circuit, held that an inalienable property interest cannot be made the res of a trust, because the creation of a trust involves a transfer of an equitable interest from the settlor to the beneficiary. *In re M.J. Hoey*, 19 F.2d 764, 764-66 (2d. Cir. 1927) (holding that a seat on the New York Stock Exchange could not be made the res of a trust since the rules of the exchange required that members own their seats free and clear); see also George G. Bogert & George T. Bogert, *Law of Trusts* 71 (5th ed. 1973). In the present case, the property was inalienable as to non-Samoans and, therefore, could not be made the subject of a trust for their benefit.

■ The trust beneficiaries contend that the Legislature did not intend to prohibit non-Samoans from holding partial interests in land, since the law permits the leasing of native land for periods of up to 55 years,[2] as well as approving trusts for the benefit of children with one Samoan parent.[3] If acquisition of a partial interest in land by a non-Samoan were not generally prohibited, however, it would have been unnecessary to outline exceptions permitting non-Samoans to acquire specific limited interests. It is apparent that these provisions permitting certain leases and trusts are narrowly tailored exceptions to the general rule of A.S.C.A. § 37.0204(b) that land acquisition by non-Samoans is prohibited.

To hold that those exceptions constituted general permission for non-Samoans to acquire other partial interests in property would defeat the general prohibition of the statute, as well as the constitutional policy directive protecting the Samoan people "against alienation of their lands." Revised Constitution of American Samoa, art. I § 3. Accordingly, if the trust arrangements do not meet the specific conditions of a statutory exception, they are subject to the general prohibition against alienation and

---

[2] A.S.C.A. §§ 37.0221-0222.

[3] A.S.C.A. § 37.0205.

are void.[4]

## A. Trusts for the Benefit of Children or Grandchildren

■ Although the beneficiaries cite A.S.C.A. § 37.0205 as one justification for the trust arrangement, it cannot provide a serious legal basis for the trusts at issue. While section 37.0205 does allow trusts for individually owned land, a Samoan proprietor must create the trust for the benefit of a son or daughter married to a nonnative, or for grandchildren arising from the mixed-race marriage. Although Douglas was married to a Samoan, the trust lands were not granted to that Samoan by a parent who was attempting to provide for his/her children or grandchildren. The lands were purchased by Magdalene with Douglas's money, and therefore do not meet the requirements of a permissible trust for the benefit of mixed race descendants, or Samoan children married to non-Samoans. Further, it is inescapable that the Legislature could just as easily have approved trusts for unrelated, non-Samoan beneficiaries. The Legislature created no such provision, and we will not do so as a court.

## B. Trusts as Leases of Native Land

The beneficiaries contend that the trusts are valid because they are in harmony with the spirit of the restrictions on alienation. "Native land may, with approval of the Governor, be leased to any person for any term not exceeding 55 years for any purpose, except for the working of minerals and the cutting of timber. " A.S.C.A. § 37.0221(a). The beneficiaries suggest that the foregoing provision is designed to permit non-Samoans to obtain short-term interests in land with title remaining in

---

[4] The Court of Appeals of New York made a similar analysis with regard to voting trusts entered into by stockholders:

> In New York voting trusts do not stand or fall on common-law theories of public policy. They are recognized and regulated by statute. Whether they would be valid at common law in the absence of a statute defining and regulating them is immaterial. Public policy in regard thereto is defined by the Legislature. Between the conflicting rules at common law a choice has been made. *No voting trust not within the terms of the statute is legal*, and any such trust, so long as its purpose is legitimate, coming within its terms, is legal. *The test of validity is the rule of the statute. When the field was entered by the legislature it was fully occupied and no place was left for other voting trusts.*

*In re Morse*, 160 N.E. 374, 376 (N.Y. 1928) (emphasis added). In the present case, when the Legislature legalized a specific type of trust for non-Samoan beneficiaries, against the background of a general prohibition against alienation of non-freehold lands to non-Samoans, it left no room for other trusts not found within the statute.

the Samoan owners, and an eventual reversion of the beneficial interest to the Samoan owners. The beneficiaries further contend that the trust arrangement fosters this objective by placing beneficial title for improvement of the land in non-Samoans for a period of less than 55 years, while ultimately returning full title to the improved land into Samoan hands.

While we may agree that the trust arrangement would be sound public policy for orderly land development in American Samoa, that question is not before us. The pertinent legal question is whether the trusts meet statutory criteria for an exception to A.S.C.A. § 37.0204(b), which prevents land acquisition by non-Samoans. They clearly do not.

The language of A.S.C.A. § 37.0221(a) permitting non-Samoans to obtain leasehold interests in land applies, by its terms, to "[n]ative land" only. Because A.S.C.A. 37.0201(d) provides that "[n]ative land means communal land," we are forced to conclude that the relevant trusts, which affected individually owned land, could not receive protection as leasehold interests.

This contention is strengthened by the fact that the forerunner to A.S.C.A. § 37.0221(a) allowed the leasing of "[a]ny communally owned or individually owned land." R.C.A.S. § 9.0108 (1961 code as amended through 1970).[5] When the Legislature revised the code they had the opportunity to retain the language of the 1962 statute, or alternatively to define "[n]ative land" in a way that would include individually owned land. The Legislature did neither of these things, and we therefore conclude that it intended to provide the lease option to communal land only.

The language of A.S.C.A. § 37.0221 requires "approval of the Governor" for the leasing of "[n]ative land," which must be obtained in accordance with specific formalities:

> (b) . . . Every such provisional agreement, stating in full its terms and conditions, shall be submitted with the plan showing the situation of the land to the Governor for approval, and it shall have no validity until such approval has been signified in

---

[5] It is doubtful whether or not this provision was ever approved in a constitutionally proper way, and thus it may never have become law in the first place. Regardless of this fact, it is clear that the Legislature could have subsequently employed language providing for the lease of individually owned land similar to the 1961 Code, but made the decision not to do so.

writing . . . .

> (c) The lessee must, within 2 calendar months after any provisional agreement to lease has been approved by the Governor, deposit in the office of the Governor a properly drawn and legally attested lease for confirmation under the hand and seal of the Governor, and such lease shall be registered in a book to be styled registrar of titles.

To our knowledge, CDI did not comply with any of the foregoing formalities to obtain a proper leasehold interest in land. While some may argue that these are mere formalities, and that the general intention of the trusts was in line with the policy objectives of the statute, we elect not to second-guess the Legislature.

■ In light of its constitutional authority to "protect the lands," the Legislature has a legitimate interest in the oversight and regulation of any land development projects by non-Samoans. This interest is legitimately furthered by requiring that detailed plans be submitted and approved by the Governor before a lease arrangement can go forward. Although the trusts may have been consistent with good public policy, they receive no protection as leasehold interests,[6] because they did not affect native land and because they sidestepped the requirement of the Governor's approval in accordance with the requisite formalities.

## II. Equal Protection

■ We note the delicate constitutional dimensions of the racial classification in A.S.C.A. § 37.0204(a). CDI has asserted that *Craddick I* was an aberrational decision, and that constitutionally suspect classifications, such as racially exclusive laws, must be carefully examined. However, it would be wholly inappropriate for the Trial Division in this case to revisit a principle settled by the Appellate Division in *Craddick I*, and we therefore decline to do so.

## III. Remedies

A.S.C.A. § 37.0230 provides that "Any alienation in violation of this chapter shall be void." The conveyance of a beneficial interest in land is alienation of land, and alienation of land to non-Samoans violates the

---

[6] A.S.C.A. § 37.0222 presents another option for protecting a leasehold interest for schools, which also requires permission from the Governor and plainly does not apply.

relevant chapter. Finding that the trusts did not come within any statutory exception to that general rule, we hold the trusts illegal and, therefore, void. Magdalene receives clear title to remaining, unsold trust lands.

The statute further provides that:

> . . . any nonnative failing to conform to this chapter, except 37.0120 and 37.0211, shall be liable to the forfeiture, to the owner of the land, of all improvements he may have erected or made . . . on the land and no action shall lie for recovery of any payment he may have made or other expenditure he may have incurred in respect thereof.

A.S.C.A. § 37.0230. The foregoing language compels the conclusion that CDI is required to forfeit all improvements on the land and investments made therein. This result seems unfair in light of the fact that Magdalene plainly assented to the trust arrangement, participated in it, and now disavows its validity. Further, Magdalene appropriated trust funds for her personal use, badly abusing her position as trustee.

In light of such circumstances, it is tempting to employ a common law estoppel theory or some other method to find that Magdalene cannot disclaim the validity of a trust that she openly participated in creating and administering. This argument, however, could be made any time property reverted back to a Samoan owner after he/she knowingly conveyed it to a non-Samoan. If we applied this estoppel theory, it would effectively destroy the enforcement mechanism of the statute, and we therefore decline to do so.

■ The land alienation laws are not written for the benefit of the individual Samoan proprietor of land, and therefore do not depend on his/her good faith for reversion to occur. A.S.C.A. § 37.0204(a) is written for the preservation of the land and culture of Samoa for the Samoan people collectively. If the Legislature has erred in crafting the law, then it should provide the corrective revision, if so inclined. As Justice Iredell said, only six years after the U.S. Constitutional Convention:

> It is [the legislative branch's] duty to legislate so far as it is necessary to carry the Constitution into effect. It is ours only to judge. We have no reason, nor any more right to distrust their doing their duty, than they have to distrust that we all do ours. There is no part of the Constitution that I know of, that

125

authorizes this Court to take up any business where they left it
. . . .

*Chisolm v. Georgia*, 2. U.S. 419, 433 (1793).  We will not circumvent or modify plainly written and democratically enacted law.

The two trusts, and their predecessor trusts, are declared void *ab initio*. At all times, Magdalene owned all lands acquired in her name and transferred to these trusts as her individually owned land.  She must honor the transfer of title to any of these lands sold to other Samoans by the trustee, including herself, effectively as her agent.  She may deal with the remaining lands as her property.

Under the present state of the evidence, we are unable to fashion any monetary remedies as may be in order.  Magdalene is clearly entitled to the funds she retained from sales of the lands.

She is also entitled to the profits CDI or others retained from the sales of the lands.  Her final entitlement to these funds from both sources is subject to reduction by the amount of trustee fees paid to her.  We cannot determine her final entitlement with reasonable certainty without plaintiffs and Magdalene accounting for receipts and disbursements related to all land transactions within their respective knowledge.  Thus, we direct both CDI, by and through its agents, including but not limited to plaintiff David Craddick, and Magdalene to submit accountings of these receipts and disbursements no later than 120 days after entry of the judgment in this action.  After the 120-day period, the court will schedule an evidentiary hearing to consider further the appropriate monetary remedies in this action.

Judgment shall enter accordingly.

It is so ordered.